# ORIGINAL

### IN THE COURT OF COMMON PLEAS
### HAMILTON COUNTY, OHIO
### CIVIL DIVISION

| | | |
|---|---|---|
| **MELISSA AND SCOTT BRAUCHER**<br>4100 Woodmont Drive<br>Batavia, OH 45103 | : | Case No.  A 1 5 0 6 9 5 6 |
| | : | |
| **Plaintiffs,** | : | JUDGE |
| | : | |
| **v.** | : | **COMPLAINT**<br>**& JURY DEMAND** |
| | : | |
| **ABUBAKAR ATIQ DURRANI, M.D.,**<br>SERVE: Orthopedic & Spine Institute,<br>203 Canal Road<br>Lahore 54000 Pakistan<br>(Serve by regular mail) | : | **(ALL NEW DR. DURRANI CASES**<br>**SHALL GO TO JUDGE**<br>**RUEHLMAN PER HIS ORDER)** |

And

**CENTER FOR ADVANCED SPINE
TECHNOLOGIES, INC.**
SERVE: Orthopedic & Spine Institute,
203 Canal Road
Lahore 54000 Pakistan
(Serve by regular mail)

And

**WEST CHESTER HOSPITAL, LLC**
7700 University Drive
West Chester, OH 45069

Serve: GH&R Business Svcs., INC.
511 Walnut Street
1900 Fifth Third Center
Cincinnati, OH 45202
(Serve via Certified mail)

And

**UC HEALTH**
Serve: GH& R BUSINESS SVCS., INC.
511 WALNUT STREET
1900 FIFTH THIRD CENTER
CINCINNATI, OH 45202
(Serve via Certified Mail)



**REGULAR MAIL WAIVER**

**REGULAR MAIL WAIVER**

FILED
2015 DEC 22 A 11: 56



EXHIBIT A

1

And

**JOURNEY LITE OF CINCINNATI, LLC:**
10475 READING RD., SUITE 115      :
CINCINNATI, OH 45241      :
     :
SERVE: CT CORPORATION SYSTEM      :
1300 EAST NINTH STREET      :
CLEVELAND, OH 44114      :
(Serve via Certified mail)      :      **REGULAR MAIL WAIVER**

**Defendants.**      :

Come now Plaintiffs, Melissa and Scott Braucher, filing this Complaint and Jury Demand pursuant to the agreement of the parties and order of the Court, stating as follows:

## FACTUAL ALLEGATIONS OF PLAINTIFF

1.      At all times relevant, Plaintiffs, Melissa and Scott Braucher ("Plaintiffs" or "Plaintiff" or "Mrs. Braucher") were married and were residents of and domiciled in the State of Ohio.

2.      At all times relevant, Defendant Dr. Abubakar Atiq Durrani ("Dr. Durrani") was licensed to and did in fact practice medicine in the State of Ohio.

3.      At all times relevant, Center for Advanced Spine Technologies, Inc. ("CAST") was licensed to and did in fact perform medical services in the state of Ohio, and was and is a corporation authorized to transact business in the state of Ohio.

4.      At all times relevant, West Chester Hospital, LLC ("West Chester Hospital") was a limited liability company authorized to transact business and perform medical services in the State of Ohio and operating under the trade name West Chester Hospital.

5.      At all times relevant, Defendant UC Health Inc., was a duly licensed corporation which included, owned, operated and/or managed multiple hospitals including, but not limited to West Chester Hospital, and which shared certain services, profits, and liabilities of hospitals including

West Chester.

6.      At all times relevant herein, West Chester Hospital held itself out to the public, and specifically to Plaintiffs, as a hospital providing competent and qualified medical and nursing services, care and treatment by and through its physicians, physicians in training, residents, nurses, agents, ostensible agents, servants and/or employees.

7.      UC Health is the corporate parent, owner and operator of West Chester Hospital, LLC.

8.      UC Health Stored BMP-2 at UC Health Business Center warehouse located in Hamilton County.

9.      UC Health is the corporate parent, owner and operator of West Chester Hospital, LLC. UC Health is located in Hamilton County making Hamilton County appropriate to bring this lawsuit.

10.    The subject matter of the Complaint arises out of medical treatment by Defendants in Hamilton County, Ohio.

11.    At all times relevant Journey Lite of Cincinnati, LLC ("Journey Lite") was a Deleware corporation transacting business and performing and managing medical services in the state of Ohio.

12.    At all times relevant herein, Journey Lite held itself out to the public, and specifically to Plaintiffs, as a hospital providing competent and qualified medical and nursing services, care and treatment by and through its physicians, physicians in training, residents, nurses, agents, ostensible agents, servants and/or employees.

13.    The amount in controversy exceeds the jurisdictional threshold of this Court.

14.    This case has been previously dismissed pursuant to Civ. R. 41(A)(1)(a) and is now being refiled within the time allowed by O.R.C. 2305.19.

3

## **FACTUAL ALLEGATIONS OF PLAINTIFF**

15.     Plaintiff was referred to Dr. Durrani in August 2009 for pain in her lower back and hips.

16.     During her initial visits with Dr. Durrani, he recommended she undergo surgery to resolve her pain.

17.     On December 4, 2009 Dr. Durrani performed an L5-S1 fusion on Plaintiff at West Chester Hospital.

18.     Following this surgery, Plaintiff's pain grew worse over time and Dr. Durrani recommended she undergo another surgery to "shave off" her disc.

19.     On December 15, 2012, Dr. Durrani performed an L4-L5 hemilaminectomy, foraminotomy and decompression procedure on Plaintiff at Journey Lite of Cincinnati.

20.     Following the surgery, Plaintiff continued to treat with Dr. Durrani and CAST through February of 2013.

21.     In the time since surgeries, Plaintiff has increased pain in her lower back and hips.

22.     Upon information and belief, Dr. Durrani used Infuse/BMP-2 "off –label" and/or Puregen without Plaintiff's knowledge or consent, causing her harm.

23.     The use of BMP-2 increases a person's chance of cancer by 3.5%

24.      Due to the unnecessary surgeries Dr. Durrani performed, Plaintiff has a 3.5% increased chance of cancer because of the use of BMP-2.

25.      As a direct and proximate result of the use and implementation of Infuse/BMP-2 Plaintiff has incurred a 3.5% increase in the risk of Cancer. As a result Plaintiff has an increased fear of Cancer.

26.     Upon information and belief, the surgeries performed by Dr. Durrani were medically unnecessary and improperly performed.

4

27.     As a direct and proximate result of Mrs. Braucher's surgeries, Dr. Durrani's negligence, and the Defendant's negligence, Mrs. Braucher has suffered harm.

28.     Mrs. Braucher did not become aware of Infuse/BMP-2 and/or Puregen until she contacted her undersigned counsel.

## MORE SPECIFIC ALLEGATIONS BASED UPON DISCOVERY AND DEPOSITION TESTIMONY

29.     This information is to demonstrate the overall negligence and inappropriate actions of Dr. Durrani and the hospitals he worked with and/or for and/or in an individual capacity.

30.     Krissy Probst was Dr. Durrani's professional and personal assistant handling professional, academic, travel, surgery scheduling, his journals, his Boards, his credentialing, his personal affairs and his bills.

31.     Krissy Probst worked as Dr. Durrani's assistant for three years at Children's Hospital from 2006, 2007, and 2008.

32.     Krissy Probst reported Dr. Durrani to Sandy Singleton, the Business Director at Children's for his having an affair with Jamie Moor, his physician assistant.

33.     Krissy Probst resigned in 2008 from Dr. Durrani and remained working for three other surgeons in the Orthopedic Department.

34.     Krissy Probst worked in the Orthopedic Department for eleven years from 2002-2013. She retired in May, 2013.

35.     Krissy Probst confirmed Dr. Durrani claims being a Prince, when he is not.

36.     According to Krissy Probst, Dr. Crawford, an icon in pediatric orthopedics treated Dr. Durrani "like a son."

5

37.     According to Krissy Probst, Dr. Crawford, Chief of Orthopedics at Children's unconditionally supported Dr. Durrani no matter the issues and problems Dr. Durrani faced.

38.     Dr. Durrani's patient care at Children's Hospital dropped off considerably after Jamie Moor became his physician assistant and they began their affair.

39.     Dr. Durrani was the only orthopedic spine surgeon at Children's who would perform a dangerous high volume of surgeries.

40.     At Children's, Dr. Durrani would begin a surgery, leave and have fellows and residents complete a surgery or do the full surgery while he was in his office with Jamie Moor, his physician assistant for four or five hours.

41.     Children's Board and administration knew about Dr. Durrani doing too many surgeries and not properly doing the surgeries. They did nothing.

42.     Dr. Durrani argued to Children's administration when they complained to him that he made them money so Children's tolerated him and allowed him to do what he wanted.

43.     Dr. Durrani, when told by Children's that Jamie Moor had to leave, told Children's that he would leave too.

44.     Dr. Agabagi would do one spine patient a day at Children's because it takes normally eight hours for a full fusion.

45.     Dr. Durrani would schedule two to three spine surgeries a day at Children's.

46.     Dr. Durrani would repeatedly have the Business Director, Sandy Singleton, or OR Director allow him to add surgeries claiming they were emergencies when they were not.

47.     Dr. Durrani would leave a spine surgery patient for four or five hours in the surgery suite under the care of fellows or residents, unsupervised and sit in his office and check on the surgery as he pleased.

6

48.     Dr. Peter Stern did not like Dr. Durrani while Dr. Durrani was at Children's because he knew all about his patient safety risk issues. Yet, Dr. Stern supported, aided and abetted Dr. Durrani's arrival at West Chester. It defies comprehension, but was for one of the world's oldest motives—greed of money.

49.     There is also a Dr. Peter Sturm, an orthopedic at Children's who also had no use for Dr. Durrani.

50.     Dr. Durrani chose his own codes for Children's billing which he manipulated with the full knowledge of Children's Board and management.

51.     Dr. Durrani was dating and living with Beth Garrett, a nursing school drop-out, with the full knowledge of his wife Shazia.

52.     Dr. Durrani was close with David Rattigan until David Rattigan pursued Jamie Moor and Dr. Durrani would not allow David Rattigan in the OR at Children's for a long time.

53.     Dr. Durrani, while claiming to have riches, does not. Dr. Durrani's wife's family paid for Dr. Durrani's education and it is her family with the significant wealth.

54.     Medtronics paid for Dr. Durrani's trips and paid him $10,000 fees for speaking or simply showing up at a spine conference.

55.     Krissy Probst's business director told her to save all Dr. Durrani related documents and information and she did.

56.     While doing research at Children's, Dr. Durrani would misstate facts regarding his research. Children's knew he did this.

57.     Dr. Durrani ended on such bad terms with Children's Hospital he was not allowed on the premises after his departure in December 2008, yet he performed a spine surgery there in February 2009.

58.     Eric J. Wall, MD was the Director of Surgical Services Division of Pediatric Orthopedic Surgery when Dr. Durrani left Children's.

59.     Sandy Singleton, MBA was the Senior Business Director of Surgical Services Division of Pediatric Orthopedic Surgery when Dr. Durrani left Children's.

60.     On information and belief, Dr. Durrani used his relationships with Children's officials to purge his Children's file of all patient safety and legal issues which had occurred as part of his departure "deal" which Defendants hide with privilege.

## INFUSE/BMP-2

## I.     BACKGROUND INFORMATION

61.     The Deters Law Firm, P.S.C., represents approximately 500 Plaintiffs in medical malpractice actions against a former Northern Kentucky/Cincinnati-area spine surgeon named Abubakar Atiq Dr. Durrani (Dr. Durrani), his company, Center for Advanced Spine Technologies, Inc. (CAST), and several area hospitals including, but not limited to, West Chester Hospital (WCH), University of Cincinnati Health (UC Health), Cincinnati Children's Hospital Medical Center (CCHMC), Christ Hospital, Deaconess Hospital, Good Samaritan Hospital and Journey Lite of Cincinnati, LLC (Journey Lite) (collectively Hospitals).

62.     Dr. Durrani performed unnecessary, fraudulent, dangerous, and ultimately damaging surgeries on these Plaintiffs while working for and with these Hospitals.

63.     The scheme and artifice to defraud that Dr. Durrani devised, executed, and attempted to execute while working for and with the Hospitals included the following patterns and practices:

       a.  Dr. Durrani persuaded the patient that surgery was the only option, when in fact the patient did not need surgery.

8

b. Dr. Durrani told the patient that the medical situation was urgent and required immediate surgery. He also falsely told the patient that he/she was at risk of grave injuries without the surgery.

c. Dr. Durrani often told his cervical spine patients that they risked paralysis or that his/her head would fall off if he/she was involved in a car accident, ostensibly because there was almost nothing attaching the head to the patient's body.

d. Dr. Durrani often ordered imaging studies such as x-rays, CT scans, or MRIs for patients but either did not read or ignored the resulting radiology reports.

e. Dr. Durrani often provided his own exaggerated and dire reading of the patient's imaging study that was either inconsistent with or was plainly contradicted by the radiologist's report. At times, Dr. Durrani provided a false reading of the imaging.

f. Dr. Durrani often dictated that he had performed certain physical examinations and procedures on patients that he did not actually perform.

g. Dr. Durrani often ordered a pain injection for a level of the spine that was inconsistent with the pain stated by the patient or with that indicated by the imaging. Dr. Durrani also scheduled patients for surgeries without learning of or waiting for the results of certain pain injections or related therapies.

h. Dr. Durrani often dictated his operative reports or other patient records months after the actual treatment had occurred.

i. Dr. Durrani's operative reports and treatment records contained false statements about the patient's diagnosis, the procedure performed, and the instrumentation used in the procedure.

j. When a patient experienced complications resulting from the surgery, Dr. Durrani at times failed to inform the patient of, or misrepresented the nature of, the complications.

k.  All of the above-mentioned actions were done with the knowledge, cooperation, or intentional ignorance of the Hospitals because Dr. Durrani was one of the biggest moneymakers for the Hospitals.

64.  In addition to the civil medical malpractice actions against Dr. Durrani, on August 7, 2013, he was indicted by the Federal Government for performing unnecessary surgeries and for defrauding the Medicare and Medicaid programs. Specifically, the ten-count complaint charged Dr. Durrani with health care fraud, in violation of 18 U.S.C. § 1347, and making false statements in health care matters, in violation of 18 U.S.C. § 1035. There was a subsequent superseding indictment adding over 30 counts.

65.  Following these criminal indictments, in December of 2013 and prior to the first Plaintiff's trial in these actions, Dr. Durrani fled the United States and returned to Pakistan. He has not returned to the United States to face allegations of either criminal or civil liability.

66.  Among Dr. Durrani's and the Hospitals' professional failings was the use of a synthetic bone-morphogenetic protein called BMP-2, which was marketed under the trade name "Infuse." Dr. Durrani used BMP-2/Infuse in ways that were either not approved by the federal Food and Drug Administration (FDA) or that were specifically contraindicated as noted on the FDA-approved product labeling. The Defendants had full knowledge of this fact.

67.  BMP-2/Infuse was, at the time of the surgeries in question, and currently still is manufactured by a company called Medtronic, Inc. (Medtronic).

68.  Dr. Durrani predominantly used BMP-2/Infuse on patients at WCH, which is owned by UC Health.

69.  It is Plaintiffs' position that this non-FDA-approved use of BMP-2/Infuse was not only negligent, and fraudulent, but criminal based upon the manner in which it was allowed to be used by Dr. Durrani at West Chester, all with the knowledge and full support of the Defendants.

## II.  THE PLAYERS REGARDING BMP-2

70.  Dr. Durrani is a citizen of the Republic of Pakistan and was a permanent resident of the United States who, from approximately 2005 to 2013, worked as a spine surgeon in and around Cincinnati, Ohio, until he fled the United States to escape civil liability and criminal prosecution.

71.  Medtronic is an Irish corporation, with its principal executive office located in Dublin, Ireland, and its operational headquarters located in Minneapolis, Minnesota. Medtronic is the world's third largest medical device company and manufactures and markets BMP-2/Infuse. Medtronic sales representatives were also present during the experimental surgeries performed on Plaintiffs, who are clients of the Deters Law Firm.

72.  CAST was a corporation organized under the laws of Ohio and had business and medical offices in Florence, Kentucky and Evendale, Ohio. CAST was owned, in whole or in part, by Dr. Durrani.

73.  Bahler Medical, Inc. is a manufacturer of medical implants and is a corporation located in the state of Ohio.

74.  David Rattigan is an Ohio resident and was and is a sales representative for Medtronic. Further, he is affiliated with Bahler Medical, Inc., was involved in many of the transactions involving BMP-2, and was present for the experimental surgeries in which BMP-2 was used.

75.  West Chester Hospital, LLC is a corporation organized under the laws of Ohio. It provides medical facilities and billing support to physicians, including Dr. Durrani, in the state of Ohio. WCH is owned by UC Health.

76.  UC Health is a private, non-profit corporation organized under the laws of Ohio. It provides medical facilities, management, administrative, ancillary, and billing support to physicians, and it owns WCH.

77. CCHMC is a medical facility in Ohio where Dr. Durrani was an employee until approximately 2008.

## III. WHAT IS BMP-2/INFUSE?

78. The full name of BMP-2 is "Recombinant Human Morphogenetic Protein-2" (also called rhBMP-2). The following definitions apply:

      a.     Recombinant – Artificially created in a lab;

      b.     Morphogenetic – Evolutionary development of an organism;

      c.     Protein – Essential for growth and repair of tissue.

79. Recombinant human protein (rhBMP-2) is currently available for orthopedic usage in the United States.

80. Medtronic manufactured, marketed, sold, and distributed BMP-2 under the trade name "Infuse."

81. BMP-2 has been shown to stimulate the production of bone.

82. Implantation of BMP-2 in a collagen sponge induces new bone formation and can be used for the treatment of bony defects, delayed union, and non-union.

## BMP-2 AS A BIOLOGIC

83. BMP-2 is not a device, but instead it is a biologic. *See* July 2009 American Medical Association Article and 2011 Stanford School of Medicine Article.

84. According to the FDA, "[a] 'biological product' means a virus, therapeutic serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, or analogous product, or arsphenamine or derivative of arsphenamine (or any other trivalent organic arsenic compound), applicable to the prevention, treatment, or cure of a disease or condition of human beings (Public Health Service ActSec.351(i)1."Available http://www.fda.gov/ICECI/Inspections/IOM/ucm122535.htm.

85.     BMP-2 is a Bone-Morphogenetic Protein that is used to promote bone creation and remolding and falls under the definition of a biologic. *See* AMA article ("bone forming properties") and Stanford Article. BMP-2 differs from a medical device in that once implanted, it can only be removed days after surgery. If a patient had a complication due to BMP-2 and did not discover this complication until year after surgery, the patient could not have BMP-2 removed to reduce the complication because BMP-2 is so integrated into the patient's bone.

86.     A patient has a right to determine what happens to his or her body and the preservation of that right requires that the patient be informed when a bone growth product, that causes irreversible harm, is placed in his or her body.

**WHEN IS IT USED?**

87.     Recombinant human BMPs are used in orthopedic applications such as spinal fusions, non-unions, and oral surgery.

88.     The bone graft contains two parts. The first is a solution of human bone growth protein or morphogenetic protein-2. This protein is found in the human body in small dosages and is important for the healing and formation of bones. The protein is genetically engineered to be utilized in the Infuse Bone Graft product, and it is employed for the stimulation of formation and growth in bones.

89.     The second part of the bone graft is an absorbable collagen sponge.

90.     Both components of the Infuse Bone Graft structure are used to fill the LT-Cage Lumbar Tapered Fusion Device. This chamber is intended to restore the deteriorated disc space to its original height.

91.     FDA-approved use for the Infuse Bone Graft product is only for lower back surgery using an anterior lumbar interbody fusion (ALIF), a technique where the operation on the spine is conducted through the abdomen.

13

92.     In addition, the Infuse Bone Graft product must be used in conjunction with Medtronic's LT-Cage. Use of BMP-2 without the LT-Cage is considered an "off-label" use.

**CONTRAINDICATIONS OF USE**

93.     The FDA specifically warns against the use of Infuse in the cervical spine, citing reports of "life-threatening complications."

94.     Any use of Infuse other than in lumbar spine surgeries with the LT-Cage is considered "off-label" use

95.     Infuse should never be used on the skeletally immature patient, i.e., in patients less than 18 years of age or those with no radiographic evidence of epiphyseal closure.

96.     Infuse should never be used in the vicinity of a resected or extant tumor.

97.     Infuse should never be used in those patients known to have active infection at the surgical site.

**RISKS ASSOCIATED WITH OFF-LABEL USE**

98.     When used in an off-label manner, patients may experience problems with pregnancy, including but not limited to: complications in fetal development; allergic reactions to titanium, bovine type I collagen, or bone morphogenetic protein–2; infection; the creation or intensification of tumors; liver or kidney disease; lupus or human immunodeficiency virus (HIV/AIDS); problems with radiation, chemotherapy, or steroids if a patient is malignant; paralysis; bowel and/or bladder dysfunctions; sexual disorders, including sterilization and incompetence; respiratory failure; excessive bleeding, and; death.

**IV.     THE REGULATORY PROCESS**

14

99.     The Medical Device Amendments (MDA) to the federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq., established two separate approval processes for medical devices: Pre–Market Approval (PMA) and Pre–Market Notification.[1]

100.    The FDA's PMA process is lengthy and involves extensive investigation by the FDA. The PMA application requires manufacturers to submit extensive animal and human data to establish their devices' safety and effectiveness. 21 C.F.R. § 814.20. Frequently, an experimental program under close FDA scrutiny must be successfully completed before FDA approval can be obtained under this process. FDA regulations also require PMA applicants to submit copies of all proposed labeling for the device. 21 C.F.R. § 814.20(b)(10). The FDA approves a PMA application only after extensive review by the agency and an advisory committee composed of outside experts. 21 C.F.R. § 814.40.[2]

101.    In contrast, the FDA's Pre–Market Notification process is more abbreviated and involves less FDA oversight. This process requires applicants to submit descriptions of their devices and other information necessary for the agency to determine whether the devices are substantially equivalent. Pre–Market Notification applicants must also submit their proposed labeling. 21 C.F.R. § 807.87. If the FDA determines that a device is substantially equivalent to a device that was on the market prior to the enactment of the MDA in 1976, the applicant is free to market the device.

102.    BMP-2 received PMA (PMA number P000058) for the Infuse/BMP-2 Lumbar Tapered Fusion Device, which PMA provided for limited use with specific requirements for its use on individuals. See Medtronic Package Insert.

---

[1] *Fender v. Medtronic,* 887 F.Supp. 1326 fn 1 (E.D. Cal.1995).

[2] *Fender v. Medtronic,* 887 F.Supp. 1326 fn 1 (E.D. Cal.1995).

## SCOPE OF THE PMA AND PRODUCT LABELING

103.    The PMA for BMP-2 provided that the product may only be used in patients with the following characteristics:

> d.      Skeletally mature patient, AND
>
> e.      At levels L2-S1, AND
>
> f.      Confirmed degenerative disc disease (DDD), AND
>
> g.      Using only an open anterior or anterior laparoscopic approach, AND[3]
>
> h.      Six months of non-operative treatment prior to treatment with the device, AND
>
> i.      In combination with the metallic LT-CAGE.[4]

See Medtronic Package Insert, "INDICATIONS."

104.    According to Medtronic's package insert for BMP-2/Infuse as well as other industry literature, the following risks are associated with the use of BMP-2/Infuse:

> A.      Male Sterility
>
> B.      Cancer
>
> C.      Increased progression of cancer
>
> D.      Suffocation of the cervical region
>
> E.      Bone fracture
>
> F.      Bowel/bladder problems
>
> G.      Loss of spinal mobility or function
>
> H.      Change in mental status
>
> I.      Damage to blood vessels and cardiovascular system compromise
>
> J.      Excessive bone mass blocking the ability to treat pain

---

[3] The anterior interbody fusion approach was developed because the risk of non-union (pseudarthrosis) is significantly higher in posterior approaches. The biggest risk factor for fusion surgery is non-union.

[4] Instrumented fusions involve hardware and are more stable fusions with a shorter recovery time than non-instrumented fusions.

K.     Damage to internal organs and connective tissue

L.     Death

M.     Respiratory problems

N.     Disassembly and migration of components

O.     Dural tears

P.     Ectopic and exuberant bone formation

Q.     Fetal development complications (birth defects)

R.     Foreign body (allergic) reaction

S.     Gastrointestinal complications

T.     Incisional complications

U.     Infection

V.     Insufflation complications

W.     Neurological system compromise

X.     Non-union

Y.     Delayed union

Z.     Mal-union

AA.    Change in curvature of spine

BB.    Retrograde ejaculation

CC.    Scars

DD.    Tissue and nerve damage

EE.    Itching

FF.    Pain

GG.    Hematoma

HH.    Anaphylactic reaction

II.    Elevated erythrocyte sedimentation rate

105. Injury Percentages:

      j.      Ectopic Bone Growth-63%

      k.     Inflammatory Neuritis-15%

      l.      Osteolysis/Subsidence-13%

      m.    Acute Swelling-7%

      n.     Retrograde Ejaculation-2%

      o.     85% of time, BMP-2 implanted in off-label use

106. Not a single one of these risks in the last two paragraphs were ever explained to a single patient at Children's Hospital by Dr. Durrani.

107. BMP-2 was NOT approved by the FDA for use in the cervical and thoracic spine and BMP-2 was NOT safe or approved for use in children less than 21 years of age. These uses are considered "off-label."

## "OFF-LABEL" USE

108. A use of a device is considered "off-label" if it is not approved under the Pre-Market Approval process OR cleared for such use pursuant to 21 U.S.C. § 360c(f) (also known as "the 510k premarket notification process").

109. Infuse can be implanted in an off-label manner in three ways:

      p.     Approach/position: Any approach other than an anterior approach;

      q.     Product: Failure to use LT-Cage (or any cage); mixing rhBMP-2 with other grafting products like Allograft or Autograft;

      r.     Discs: Use on multiple levels or on a level outside of L2-S1.

110. Dr. Durrani and the Hospitals in which he performed surgeries repeatedly used BMP-2 in these non-FDA-approved manners.

## THE NON-COMPLIANCE WITH THE REGULATORY PROCESS

111.    The PMA 000058 "Conditions of Approval" specifies the following condition: "Before making any change affecting the safety or effectiveness of the device, submit a PMA supplement for review and approval by the FDA … [a] PMA supplement or alternate submission shall comply with applicable requirements under 21 C.F.R. 814.39[.]"

112.    21 C.F.R. 814.39 requires a PMA supplement pursuant to subsection (a)(1) for new indications of use of the device and pursuant to subsection (a)(6) for changes in components.

113.    The PMA 000058 "Conditions of Approval" notes the post-marketing reporting requirement imposed by 21 C.F.R. 814.84, particularly "Identification of changes described in 21 C.F.R. 814.39(a)." Medtronic did not comply with this requirement relating to the intended uses and componentry.

114.    The FDA can impose post-approval requirements in the PMA pursuant to 21 C.F.R. 814.82, and this fact results in the device being characterized as "restricted" pursuant to 21 U.S.C. § 360j(e) for purposes of 21 U.S.C. § 352(q). Section 352(q) states that any restricted device that is distributed or offered for sale with false or misleading advertising is "misbranded."

115.    "Indications for use" is a necessary part of the PMA application and the "Indications for use" are required to be limited by the application. Any different use is inconsistent with the PMA.

116.    A device that fails to meet the requirements of the PMA or 21 C.F.R. 814 is "adulterated" as defined by 21 U.S.C. § 351(f).

117.    21 C.F.R. 801.6 defines a misleading statement related to a DIFFERENT device contained in the label delivered with the device intended to be used will render the device to be used misbranded.

118.    Medtronic did not apply for a PMA supplement, as required by the FDA generally and PMA 000058 specifically, for the off-label uses, nor did it provide warnings of the risks known about the off-label uses. All named Defendants in these cases knew about the occurrences of off-label use.

119.    The PMA requires an application prior to marketing for new indicated uses by incorporating the federal requirements and explicitly reciting the text of 21 C.F.R. 814.39 and 814.84 and by specifically stating the range of indicated uses on the PMA.

## V.    **MEDTRONIC**

120.    In or about 2001, Medtronic began preparing for the launch of two spinal fusion products, PYRAMID and INFUSE (BMP-2), which it projected would enjoy broad application with spinal surgeons and their patients on a nationwide basis.

121.    Medtronic anticipated that both products would initially be limited in application.

122.    Motivated by greed and a desire to gain competitive advantage in the marketplace, Medtronic began a course of conduct designed to broaden the application of both products by end-users. The course of conduct involved fraud, false statements, material misrepresentation, and deceit for the purpose of broadening the sales of these products beyond that which the usual acceptance within the scientific community or regulatory approval would otherwise allow.

123.    On or after July 2, 2002, Medtronic received notification that its Pre-Market Approval application for its BMP-2/Infuse bone graft products had been approved by the FDA. However, such approval was limited to the application of the device from the L4 through S1 levels. Further, the approval mandated the conduct of post-approval studies to evaluate the long-term performance of the BMP-2 bone graft and to study the potential side effects and complications such as the promotion of tumors by the bone morphogenetic protein component of BMP-2. Other

studies were conducted as well. See "Allegations against Medtronic in the Unsealed Mississippi False Claims Case."

124. Medtronic engaged in a fraudulent course of conduct designed to maximize its revenues from BMP-2, regardless of whether it would eventually be allowed to remain on the market.

125. One of the physicians Medtronic co-opted into its fraudulent scheme was a Thomas A. Zdeblick, M.D. Dr. Zdeblick was an orthopedic surgeon whose invention, the LT-Cage, was the only approved device to act as the delivery vehicle for BMP-2 into the body.

126. Dr. Zdeblick enjoyed a position within the scientific community as a Key Opinion Leader, and he was both a practicing orthopedic surgeon and professor at the University of Wisconsin.

127. In one of Dr. Zdeblick's first attempts to tout his LT-Cage and rhBMP-2, which would become the active ingredient in the ultimate Infuse/BMP-2 product, he encountered some drawbacks to his goal of promoting his and Medtronic's products, which arose from the policy of certain industry journals, including the journal *Spine,* which followed industry standards before printing peer-reviewed material. See article in the journal *Spine,* published in 2000.

128. Not only were the drawbacks related to industry publishing standards, but the National Consumer Health Information and Health Promotion Act of 1976 enacted certain provisions at 42 U.S.C. § 300u, et seq., whereby the Federal Government had entered the field of medical research publication. Such standards promulgated by the Secretary of the predecessor to the U.S. Department of Health and Human Services required that applications for grants and contracts must be subject to "appropriate peer review." See 42 U.S.C. § 300u-1.

129. The drawbacks encountered with the peer-reviewed *Spine* article were as follows:

        a.      Attribution that the study was "sponsored by Medtronic Sofamor Danek, Inc.;"

b. The study was conducted under FDA regulations, and was "...designed as a prospective, multicenter, nonblinded, randomized, and controlled pilot study;" and

c. It was accompanied by a cautionary comment, or Point of View, which minimized the exuberance and import of the article.

130. In the article, BMP-2 was touted by Zdeblick and the co-authors as the potential realization of a dream of Dr. Marshall Urist, a revered pioneer in the industry and discoverer of BMP, where it closed with the following: "...it is encouraging to note that Marshall Urist's seminal observation made more than 34 years ago may finally come to clinical fruition."

131. In the Point of View, a Dr. John O'Brien of London questioned whether there could be long-term problems associated with the product. He treated Zdeblick's study with caution and pointed out that simple plaster of Paris has achieved the same or similar results more than 50 years prior. He posited that, "[p]erhaps vascularization...fixation procedures are as important as the biochemical composition of the 'filler.'"

132. Vascularization is achieved through removal of the disc material between two vertebral bodies and then the scraping of the surfaces of the vertebral bodies in a fusion procedure; fixation is the process of securing the motion segment through medical hardware. In other, if the alternative proposed by Dr. O'Brien proved to achieve equivalent or better results, Zdeblick and Medtronic's Infuse/BMP-2 products would be useless and unnecessary.

133. Certain efforts would follow in an attempt to alleviate the drawbacks encountered with the 2000 *Spine* journal article.

134. In 2002, Dr. Zdeblick was installed as the sole editor-in-chief of a medical journal known prior to his installation as the *Journal of Spinal Disorders*. Prior to his installation, the journal enjoyed a fourteen year history under the co-editorship of Dr. Dan Spangler and Dr. Tom Ducker. Once installed, Dr. Zdeblick successfully supplanted Drs. Dan Spengler and Tom

22

Ducker and became the sole editor-in-chief, a position which would enable him to have greater control and would aid his participation in the fraudulent scheme.

135. During this same time period, Dr. Zdeblick also enjoyed a position on the associate editorial board of the medical journal *Spine*, the leading publication covering all disciplines relating to the spine.

136. In one of Dr. Zdeblick's actions as editor-in-chief, he set about re-purposing the journal in a way that would aid him in the furtherance of the fraudulent scheme through the streamlining of the publication process.

137. In furtherance of the fraudulent scheme, Dr. Zdeblick re-purposed the journal and renamed it the *Journal of Spinal Disorders and Techniques* (JSDT), announcing that the new journal was "entering a new partnership with *Spine*." As part of this partnership, *Spine* would "continue to function as a broad-based scientific journal" tailored to both clinicians and scientists. However, the *Journal of Spinal Disorders and Techniques* would be directed solely to physicians in clinical practice.

138. Dr. Zdeblick's stated goal was "to provide a forum for up-to-date techniques...", and in furtherance of that goal, Dr. Zdeblick announced that his journal would publish Class II or better clinical articles but would "occasionally accept cutting edge articles with less than one year follow-up." To justify this streamlined process, Dr. Zdeblick claimed as his goal the ability of his journal "to keep up with the fast pace of progress in the treatment of spinal patients."

139. Arm-in-arm with Medtronic and others, Dr. Zdeblick would in short order abuse his position of trust as the editor-in-chief of JSDT.

140. In the October 2002 edition, JSDT published an article entitled, "Anterior Lumbar Interbody Fusion using rhBMP-2 with Tapered Interbody Cages." This article was co-authored

23

by, among others, Curtis A. Dickman, M.D., who was a developer of Medtronic's PYRAMID plate and who has been paid significant sums by Medtronic through royalty agreements, consulting agreements, and education training and speaking agreements.

141.    In addition to his interest in the PYRAMID plate, Dr. Dickman had assisted Medtronic in the approval process for Infuse/BMP-2. As part of the pre-approval hearing process, Dr. Dickman and his Barrow Neurological Associates Group of Phoenix, Arizona had submitted a letter to the meeting of the FDA's Orthopedics and Rehabilitation Devices Advisory Panel, which met on January 10, 2002. In that letter, Dr. Dickman represented that "approval of BMP would provide a significant advance for patient outcome and satisfaction following spinal fusion."

142.    In the October 2002 issue of JSDT touting the benefits of Infuse/BMP-2, Zdeblick and others failed to disclose their financial ties to Medtronic, though industry standards require such acknowledgement. Not only did Dr. Zdeblick fail to disclose that he profited from each and every surgery which Infuse/BMP-2 was used through rights in the exclusive delivery vehicle, his LT-Cage, but no reference whatsoever to their financial ties to Medtronic was made either by Dr. Zdeblick or Dr. Dickman.

143.    For years, the recognized gold standard for spinal bone grafts has been the use of autogenous bone, or bone harvested from the patient's own iliac crest, or hip bone. Medtronic designed to have its Infuse/BMP-2 product supplant autogenous bone as the gold standard in the medical community, and utilized false statements, a fraudulent enterprise and the support of Federal funds to do so.

144.    As part and parcel of Medtronic's fraudulent scheme, the October 2002 study was published in Dr. Zdeblick's journal three months after Medtronic received FDA approval for

24

Infuse. As the article shows, it was actually received on March 28, 2002 or after Dr. Zdeblick had accomplished installment as the editor-in-chief, and was accepted by Dr. Zdeblick's journal for publication on July 30, 2002.

145.    At the same time Dr. Zdeblick's journal was publishing the initial article on Infuse, Dr. Zdeblick was already finalizing and preparing for subsequent publication a follow-up article to tout Infuse potentially as the new gold standard. A second article, co-authored by Dr. Zdeblick and two other co-authors of the original article, was entitled "Is Infuse Bone Graft Superior to Autograft Bone? An Integrated Analysis of Clinical Trials using the LT-Cage Lumbar Tapered Fusion Device."

146.    This second article was published in Vol. 2 of 2003 and once again, there was no mention of Dr. Zdeblick's financial ties to Medtronic.

147.    This second article would serve as the second covert advertisement for the Infuse product, and the article states that "the purpose of our analysis was to investigate the potential statistical superiority of Infuse bone graft to autograft..."

148.    This second article went on to announce the July 2002 FDA approval of rhBMP-2.

149.    This article included as an "acknowledgment" an expression of gratitude to the physicians "who provided patients for this study and to the clinic research group at Medtronic Sofamor Danek for their help in data collection and statistical analyses." However, the article still failed to advise the medical community that some or all of the authors reaching these conclusions touted as monumental had direct financial interests tied to those conclusions.

150.    Rather, the failure to report these clear conflicts of interest on the part of those holding positions of trust both within the medical community and over patients was part of Medtronic's

157. On July 1, 2008 the FDA issued a Public Health Notification entitled "Life-Threatening Complications Associated with Recombinant Human Bone Morphogenetic Protein in Cervical Spine Fusion."

158. This notification was sent to health care practitioners all across the United States warning of the complications associated with BMP-2, specifically when used in the cervical spine.

159. In the notification the FDA stated they received at least 38 reports of complications during the prior four years with the use of BMP-2 in cervical spine fusions.

160. The complications were associated with swelling of the neck and throat areas, which resulted in compression of the airway and/or neurological structures in the neck.

161. Some reports describe difficulty swallowing, breathing or speaking and severe dysphagia following cervical spine fusion using BMP-2 products had also been reported.

162. The notification further stated that, "since the safety and effectiveness of rhBMP for treatment of cervical spine conditions has not been demonstrated, and in light of the serious adverse events described above, FDA recommends that practitioners either use approved alternative treatments or consider enrolling as investigators in approved clinical studies.

163. The Notification further emphasized the importance of fully informing patients of these potential risks and said that patients treated with BMP-2 in the cervical spine should know:

    s.     The signs and symptoms of airway complications, including difficulty breathing or swallowing, or swelling of the neck, tongue, mouth, throat and shoulders or upper chest area

    t.     That they need to seek medical attention immediately at the first sign of an airway complication

    u.     That they need to be especially watchful 2-14 days after the procedure when airway complications are more likely to occur

27

v.      rhBMP-2 (contained in Infuse Bone Graft) has received pre-market approval for fusion of the lumbar spine in skeletally mature patients with degenerative disc disease at one level from L2-S1 and for healing of acute, open tibial shaft fractures stabilized with an IM nail and treated within 14 days of the initial injury.

164.    Additionally, BMP is not approved in any manner for use in patients who are skeletally immature (<18 years of age) or pregnant.

165.    Dr. Durrani and the Hospitals ignored ALL of these warnings and used BMP-2 in cervical spine surgeries, children, and those with known compromising factors such as osteoporosis, smoking, and diabetes.

166.    Furthermore, the Notification stated that the FDA requires hospitals and other user facilities to report deaths and serious injuries associated with the use of medical devices.

167.    The Hospitals that allowed Dr. Durrani to use BMP-2 in their facilities failed to report any complications resulting from his use of BMP-2.

## VII.    SENATE FINANCE COMMITTEE REPORT

168.    Medtronic's actions did not go unnoticed, and in June of 2011 the Senate Finance Committee began an investigation into the fraudulent actions of Medtronic.

169.    Medtronic produced more than 5,000 documents pertaining to 13 different studies of BMP-2 for the investigation.

170.    On October 25, 2012, Senate Finance Committee Chairman Max Baucus (D-Mont.) and senior member Chuck Grassley (R-Iowa) released the results of their 16-month investigation into Medtronic, which revealed questionable ties between the medical technology company and the physician consultants tasked with testing and reviewing Medtronic products.

171. The investigation revealed that Medtronic employees collaborated with physician authors to edit and write segments of published studies on BMP-2/Infuse without publicly disclosing this collaboration.

172. These fraudulently-produced studies may have inaccurately represented BMP-2's risks and may have placed added weight on the side effects of alternative treatments.

173. The Senate investigation further found that Medtronic also maintained significant, previously undisclosed financial ties with physicians who authored studies about BMP-2, making $210 million in payments to physicians over a 15-year period.

174. Senator Baucus stated, "Medtronic's actions violate the trust patients have in their medical care. Medical journal articles should convey an accurate picture of the risks and benefits of drugs and medical devices, but patients are at serious risk when companies distort the facts the way Medtronic has. Patients everywhere will be better served by a more open, honest system without this kind of collusion."

175. Senator Grassley stated, "The findings also should prompt medical journals to take a very proactive approach to accounting for the content of the articles along with the authorship of the articles and the studies they feature. These publications are prestigious and influential, and their standing rests on rigorous science and objectivity. It's in the interest of these journals to take action, and the public will benefit from more transparency and accountability on their part."

176. Major findings of the investigation include:

    a.    Medtronic was involved in drafting, editing, and shaping the content of medical journal articles authored by its physician consultants who received significant amounts of money through royalties and consulting fees from Medtronic. The company's role in authoring or substantially editing these articles was not disclosed in the published

articles. Medical journals should ensure that any industry role in drafting articles or contributions to authors is fully disclosed.

b.     Medtronic paid a total of approximately $210 million to physician authors of Medtronic-sponsored studies from November 1996 through December 2010 for consulting, royalty and other arrangements.

c.     An e-mail exchange shows that a Medtronic employee recommended against publishing a complete list of adverse events, or side effects, possibly associated with BMP-2/Infuse in a 2005 *Journal of Bone and Joint Surgery* article.

d.     Medtronic officials inserted language into studies that promoted BMP-2 as a better technique than an alternative by emphasizing the pain associated with the alternative.

e.     Documents indicate that Medtronic prepared one expert's remarks to the FDA advisory panel meeting prior to BMP-2 being approved. At the time, the expert was a private physician but was later hired to be a vice president at Medtronic in 2007.

f.     Medtronic documents show the company successfully attempted to adopt weaker safety rules for a clinical trial studying BMP-2 in the cervical spine that would have allowed the company to continue the trial in the event that patients experienced severe swelling in the neck.

## VIII.  YODA STUDY

177.    In response to the various controversies surrounding BMP-2/Infuse, including a June 2011 article in the journal *Spine,* the Yale University Open Data Access (YODA) team reached an agreement for Medtronic to provide full individual participant data from all their trials of rhBMP-2 and allow unrestricted independent re-analysis of this data.

178.    The YODA study involved research teams at two universities – the University of York and the Oregon Health and Science University.

30

179.    The review focused exclusively on the use of rhBMP-2 in patients undergoing spinal

fusion surgery for treatment of degenerative disc disease, spondylolisthesis, or any other relevant

spinal condition.

180.    The three main objectives of the study were: 1) to examine the potential benefits of BMP-

2, 2) to examine the potential harms of BMP-2, and 3) to assess the reliability of the published

evidence base.

181.    Medtronic submitted data from 17 studies, including 12 randomized controlled trials

(RCTs).

182.    In total, the YODA study analyzed the data from 1,409 participants.

183.    Though the results showed moderate success with fusions as a result of BMP-2, the study

found that BMP-2 results in several different complications including: arthritis, implant-related

events, retrograde ejaculation, wound complications, and neurological, urogenital, and vascular

events.

184.    In regard to the alleged tampering with the peer-reviewed studies by Medtronic, the

YODA study found that only two out of twenty peer-reviewed journal publications reported a

comprehensive list of all adverse events that occurred during the studies.

185.    Furthermore, the way in which adverse event data was presented in the literature was

inconsistent, and the rationale for presenting some adverse events but not others was rarely clear.

186.    The study concluded that for the period up to 24 months after surgery, treatment with

BMP-2 increases the probability of successful fusion (according to Medtronic definitions and

reports, which the study noted "were subjective so it is not possible to confirm whether reported

successful fusions truly were successful" see YODA Study, p. 35) but this does not translate to

clinically meaningful benefits in pain reduction, function, or quality of life. The small benefits in

31

these outcomes observed from six months onward come at the expense of more pain in the immediate post-operative period and a possible increased risk of cancer.

187.    Even more relevant to the case against Dr. Durrani and the Hospitals is the YODA study's conclusion that, "[i]t is very important that these findings are expressed clearly and discussed with patients so that they can make informed choices about the type of surgery they would prefer." *Id.*

188.    The University of Oregon Study determined that Infuse/BMP-2 is not better than Autograft, while the University of York study determined that Infuse/BMP-2 offers only a slight and not statistically significant advantage over Autograft.

189.    The YODA study concluded that Medtronic "misrepresented the effectiveness and harms through selective reporting, duplicate publication, and underreporting."

190.    Adverse event categories such as heterotopic bone formation, osteolysis, and radiculitis were not included in participant databases or internal reports; therefore, the safety profile was not fully assessed.

191.    The YODA study further concluded that Medtronic was involved in drafting, editing, and shaping the content of medical journal articles on Infuse/BMP-2 authored by its physician consultants who received significant amounts of money through royalties and consulting fees from Medtronic. The company's significant role in authoring or substantively editing these articles was not disclosed in the published articles.

192.    Medtronic paid a total of approximately $210 million to the physician authors of Medtronic-sponsored studies on Infuse from November 1996 through 2010 for consulting, royalty and other arrangements.

193.   An email exchange showed that a Medtronic employee recommended against publishing a complete list of adverse events or side effects possibly associated with Infuse in a 2005 *Journal of Bone and Joint Surgery* article.

194.   Medtronic officials inserted language into studies that promoted Infuse as a better technique than an alternative procedure by overemphasizing the pain associated with the alternative procedure.

195.   Medtronic's actions violated the trust patients have in their medical care. Medical journal articles should convey an accurate picture of the risks and benefits of drugs and medical devices, but patients are at serious risk when companies distort the facts the way Medtronic has. See United States Senate Committee on Finance, October 2012.

196.   Infuse was intended for a single level anterior lumbar interbody fusion performed with all three components in a specific spinal region. The three components are a tapered metallic spinal fusion cage (NOT PLASTIC), a recombinant human (BMP) bone Morphogenetic Protein, and a carrier/scaffold for the BMP and resulting bone. The Infuse product is inserted into the LT-CAGE Lumbar tapered Fusion Device component to form the complete Infuse Bone Graft/LT–Cage Lumbar Tapered Fusion Device. These components must be used as a system. The Infuse Bone Graft component must not be uses without the LT-Cage Lumbar Tapered Fusion Device component.

197.   BMP-2 is not supposed to be used in minors.

198.   BMP-2 is not supposed to be used with smokers and diabetics because of vascular slowing.

199.   BMP-2 should not be used with women in child bearing years.

200.    BMP-2 is contraindicated for patients with a known hypersensitivity to rhBMP-2 and should not be used in the vicinity of a resected or extant tumor, in patients with active malignancy, or in patients undergoing treatment for a malignancy.

## IX.    DR. DURRANI AND BMP-2

201.    Despite all of these warning signs, Dr. Durrani, with the full knowledge of the Defendants, continued to use BMP-2 in ways not approved by the FDA, or in an "off-label" manner.

202.    As early as 2007, Dr. Durrani and UC Health knew there were issues with BMP-2 because insurance companies such as Anthem were refusing to pay for BMP-2.

203.    Medtronic provided in writing to Dr. Durrani and CAST the approved uses for Infuse/BMP-2.

204.    However, Dr. Durrani and the Defendants continued to use BMP-2 in off-label ways, including but not limited to:

        a.    Using BMP-2/Infuse in children, despite Medtronic specifically requiring it be used only in "skeletally mature patients;"

        b.    Using it outside the L2-S1 level of the spine;

        c.    Ignoring the requirement that BMP-2/Infuse only be used for Grade 1 spondylolisthesis or Grade 1 retrolisthesis;

        d.    Not requiring at least six months of non-operative treatment prior to the use of BMP-2/Infuse;

        e.    Using BMP-2/Infuse without the required cage;

        f.    Not using the "carrier scaffold" in conjunction with BMP-2/Infuse as required;

34

      g.      Using BMP-2/Infuse without proper training despite Medtronic's warning,

"Caution: Federal (USA) law restricts this device to sale by or on the order of a physician

with appropriate training or experience."

205.    Dr. Durrani was a paid consultant for Medtronic.

206.    According to Dr. Durrani's own deposition testimony in several cases, Medtronic

required one of their representatives to be present in the operating room when its product BMP-

2/Infuse is used.

207.    Because Medtronic representatives were present in these surgeries, Medtronic knew

when Dr. Durrani used BMP-2/Infuse outside the approved uses according to Medtronic's own

guidelines.

208.    Dr. Durrani was encouraged by Medtronic to obtain peer review and published studies

from Medtronic sales representatives to support his use of BMP-2/Infuse.

209.    Dr. Durrani was encouraged by Medtronic to be an advocate for his patients and describe

how BMP-2/Infuse technology can benefit them.

210.    When asked how he got his Medtronic grant, Dr. Durrani responded, "You apply to the

Medtronic's corporate and say this is what we want to do, like everybody else in the country

applies, and then they come and evaluate the thing and say, "Okay, we think it's worthy. We'll

give you the grant."

211.    In regard to his role as a Medtronic consultant, Dr. Durrani stated, "If there are certain

products that they help us in developing, then they will come to us for a certain consultant role

for a certain product development."

212.    Dr. Durrani also stated, "I was involved in the development of the minimally invasive

spine instrumentation."

213.    Dr. Durrani gave conflicting reports on his financial relationship with Medtronic.

35

214.   In a deposition, when asked when his relationship with Medtronic began, Dr. Durrani responded "2000-it's 2003, '04. Something in that category. I'm not sure. It's on the Medtronic website. You can go look at it."

215.   Medtronic's website has no information regarding their relationship with Dr. Durrani.

216.   In another deposition, Dr. Durrani stated he began his relationship with Medtronic in "2005 or '06."

217.   Dr. Durrani also gave conflicting reports on how much compensation he received from Medtronic for his consultation services.

218.   In one deposition, Dr. Durrani stated in response to an inquiry as to how much payment he received, "It's a standard compensation. Again, it's on the website, how much they've paid us."

219.   Again, this information is not available on the Medtronic website.

220.   In another deposition, when asked if he received income from Medtronic, Dr. Durrani replied, "No, I don't."

221.   When questioned further if he received a fee as a consultant, he stated, "If you do a work, there is a contractual obligation that they have to pay you. As I told you in my last deposition, they did declare it on their website, so you can actually go on the website and see how much they paid."

222.   In another deposition, Dr. Durrani stated that he received, "less than $10,000 in ten years" from Medtronic.

223.   An email dated July 30, 2008 from Medtronic Senior Product Manager Katie Stamps to Dr. Durrani states that she "is in the process of working on the renewal of your [Dr. Durrani's]

consulting agreement." As stated, this information is not available on Medtronic's website, nor is any information relating to Dr. Durrani's role as a consultant for Medtronic.

224. A CCHMC packet relating to its Orthopedics department indicated that Dr. Durrani received $60,000 in grants, contracts, or industry agreements from Medtronic Sofamor Danek in FY 2008.

225. Financial information discovered concerning Dr. Durrani's relationship with Medtronic was found in Dr. Durrani's biography on the website for the Orthopaedic & Spine Institute, which Dr. Durrani currently operates in Pakistan. The biography states that "Dr. Atiq Dr. Durrani has also received the Clinical Spine Fellowship Grant by the Department of Orthopaedic Surgery which was funded by Medtronic Sofamor Danek with a budget of $59,170 per year." See http://www.osi.com.pk/doctor/dr-atiq-Dr. Durrani-md/.

226. When a request was made to Medtronic regarding its affiliation with Dr. Durrani, the *Medtronic Supplier Relations Team stated that Dr. Durrani's "name [is] not listed in our system."*

227. Medtronic further responded to the Deters Law Firm's request that the firm would need a "Vendor I.D. Number," which neither Medtronic nor any other party has provided.

228. David Rattigan, was Dr. Durrani's main Medtronic representative from Bahler Medical.

229. David Rattigan and Medtronic have the same lawyer. Despite the Deters Law Firm's willingness to cooperate in scheduling the date for a deposition, they have refused until recently. Mr. Rattigan's deposition was taken June 5, 2015.

230. In summary, clients of the Deters Law Firm, with the full knowledge and intentional consent of all Defendants, became unsuspecting experiments for real world testing of Medtronic hardware and BMP-2, by and through Dr. Durrani and CAST, who had secret financial

connections to Medtronic, improper motives, and submitted false claims. The government paid for many of these improper and unregulated experiments as a result of the false claims made by Dr. Durrani, with the knowledge of Medtronic, under the veil of "medically necessary" surgeries.

231. Despite repeated requests, Medtronic has refused to cooperate in providing any requested information and is actively downplaying their connections to Dr. Durrani.

## X.   THE DEFENDANTS AND BMP-2

232. The purpose of the background information on the following Defendants and BMP-2 concerning other hospitals is to show the egregious methods, which upon information and belief were used at all hospitals.

233. The Defendants allowed and encouraged these practices by Dr. Durrani for the sole purpose of money and greed.

234. David Rattigan was always present in Dr. Durrani's operating rooms as a representative of Medtronic.

235. David Rattigan's sole job was to deliver the BMP-2/Infuse to the Hospitals and make sure that it was inserted correctly into the patient.

236. David Rattigan's presence in the OR further supports the Defendants awareness of Dr. Durrani's fraudulent use of BMP-2/Infuse.

237. **Informed Consent for Surgical or Medical Procedure and Sedation:**

It is the responsibly of the attending physician to obtain informed consent prior to the procedure. The patient, or his/her representative, will be advised by his/her physician of:

      a.    The explanation of the procedure

      b.    The benefits of the procedure

      c.    The potential problems that might occur during recuperation

      d.    The risks and side effects of the procedure which could include but are not limited to severe blood loss, infection, stroke or death.

e.     The benefits, risks and side effect of alternative procedures including the consequences of declining this procedure or any alternative procedures.

f.     The likelihood of achieving satisfactory results

Completion of the "Consent to Hospital and Medical Treatment" form to examine and treat is NOT sufficient as consent to perform a surgical procedure, invasive procedure, or for medical regimens of substantial risk or that are the subject of human investigation or research.

238.   The Defendants had the responsibility to carry out these consent rules.

239.   Dr. Durrani oftentimes used BMP-2 "off-label" when performing surgeries.

240.   BMP-2 is manufactured, marketed, sold and distributed by Defendant Medtronic under the trade name "Infuse."

241.   Dr. Durrani is a consultant for Medtronic.

242.   Defendants did not inform Plaintiffs of Durrani's financial interest, conflicts of interest or consulting arrangement with Medtronic.

243.   Medtronic, provided in writing to Dr. Durrani the approved uses for BMP-2, the substance also referred to as Infuse, which is a bone morphogenic protein, used as an artificial substitute for bone grafting in spine surgeries.

244.    BMP-2 is not approved by the Food and Drug Administration for use in the cervical and thoracic spine.

245.   BMP-2 is neither safe nor approved for use on children less than twenty one (21) years of age.

246.   For use in spinal surgery, BMP-2/Infuse is approved by the FDA for a limited procedure, performed on a limited area of the spine, using specific components. Specifically, the FDA approved Infuse for one procedure of the spine: Anterior Lumbar Interbody Fusion ("ALIF" or "Anterior" approach); and only in one area of the spine: L4 to S1; and only when used in

conjunction with FDA-Approved Components: LT-CAGE Lumbar Tapered Fusion Device Component ("LT-CAGE")

247.   Use of Infuse in cervical or thoracic surgery, or use through the back (posterior), or side (lateral), or on areas of the spine outside of the L4-S1 region (e.g., the cervical spine), or using components other than or in addition to the LT-CAGE is not approved by the FDA, and thus such procedures and/or use of non-FDA approved componentry is termed "off-label."

248.   When used off-label, Infuse frequently causes excessive or uncontrolled (also referred to as "ectopic" or "exuberant") bone growth on or around the spinal cord. When nerves are compressed by such excessive bone growth, a patient can experience, among other adverse events, intractable pain, paralysis, spasms, and cramps in limbs.

249.   The product packaging for BMP-2/Infuse indicates it causes an increased risk of cancer four (4) times greater than other bone graft alternatives.

250.   Dr. Durrani and Children's Hospital personnel did not disclose to Plaintiffs their intent to use BMP-2/Infuse, and further, did not disclose their intent to use BMP-2/Infuse in a way not approved by the FDA.

251.   Dr. Durrani used BMP-2 in Plaintiff in a manner not approved by Medtronic or the FDA.

252.   Defendants did not inform Plaintiffs that Dr. Durrani used Infuse/BMP-2 in his surgeries.

253.   Plaintiffs would not have allowed BMP-2 to be used by Dr. Durrani in his surgery in a manner that was not approved by the FDA or Medtronic, Infuse/BMP-2's manufacturer.

254.   Plaintiffs would not have consented to the use of BMP-2 in Plaintiff's body if informed of the risks by Dr. Durrani or any Children's Hospital personnel.

255.   The written informed consent of Dr. Durrani signed by Plaintiffs lacked the disclosure of Infuse/BMP-2's use in his procedures.

40

256.    Plaintiffs never received a verbal disclosure of Infuse/BMP-2 from Dr. Durrani or any Children's Hospital personnel.

257.    Medtronic specifically required Infuse/BMP-2 only be used in "skeletally mature patients" with degenerative disc disease.

258.    Medtronic required at least six (6) months of non-operative treatment prior to use of Infuse/BMP-2.

259.    Dr. Durrani regularly used Infuse/BMP-2 without this six (6) month non-operative treatment.

260.    Medtronic required BMP-2 always be used in conjunction with a metal LT cage.

261.    Dr. Durrani regularly used BMP-2 without a proper LT cage in his surgeries.

### INFUSE/BMP-2

262.    Dr. Durrani oftentimes used BMP-2 "off-label" when performing surgeries.

263.    BMP-2 is manufactured, marketed, sold and distributed by Defendant Medtronic under the trade name "Infuse."

264.    Dr. Durrani is a consultant for Medtronic.

265.    Defendants did not inform Plaintiffs of Durrani's financial interest, conflicts of interest or consulting arrangement with Medtronic.

266.    Medtronic, provided in writing to Dr. Durrani and CAST the approved uses for BMP-2, the substance also referred to as Infuse, which is a bone morphogenic protein, used as an artificial substitute for bone grafting in spine surgeries.

267.    BMP-2 is not approved by the Food and Drug Administration for use in the cervical and thoracic spine.

41

268.    BMP-2 is neither safe nor approved for use on children less than twenty one (21) years of age.

269.    For use in spinal surgery, BMP-2/Infuse is approved by the FDA for a limited procedure, performed on a limited area of the spine, using specific components. Specifically, the FDA approved Infuse for one procedure of the spine: Anterior Lumbar Interbody Fusion ("ALIF" or "Anterior" approach); and only in one area of the spine: L4 to S1; and only when used in conjunction with FDA-Approved Components: LT-CAGE Lumbar Tapered Fusion Device Component ("LT-CAGE").

270.    Use of Infuse in cervical or thoracic surgery, or use through the back (posterior), or side (lateral), or on areas of the spine outside of the L4-S1 region (e.g., the cervical spine), or using components other than or in addition to the LT-CAGE is not approved by the FDA, and thus such procedures and/or use of non-FDA approved componentry is termed "off-label."

271.    When used off-label, Infuse frequently causes excessive or uncontrolled (also referred to as "ectopic" or "exuberant") bone growth on or around the spinal cord. When nerves are compressed by such excessive bone growth, a patient can experience, among other adverse events, intractable pain, paralysis, spasms, and cramps in limbs.

272.    The product packaging for BMP-2/Infuse indicates it causes an increased risk of cancer four (4) times greater than other bone graft alternatives.

273.    Dr. Durrani, CAST staff and employees, Journey Lite personnel, and West Chester/UC Health personnel did not disclose to Plaintiffs their intent to use BMP-2/Infuse, and further, did not disclose their intent to use BMP-2/Infuse in a way not approved by the FDA.

274.    Dr. Durrani used BMP-2 in Plaintiff in manners not approved by Medtronic or the FDA.

275.    Plaintiff was not informed by Defendants that Dr. Durrani used Infuse/BMP-2 in her surgeries.

276.    Plaintiff would not have allowed BMP-2 to be used by Dr. Durrani in her surgeries in a manner that was not approved by the FDA or Medtronic, Infuse/BMP-2's manufacturer.

277.    Plaintiff would not have consented to the use of BMP-2 in her body if informed of the risks by Dr. Durrani, CAST staff and employees, or any West Chester/UC Health personnel.

278.    The written informed consent of Dr. Durrani, CAST, Journey Lite personnel, and West Chester/UC Health signed by Plaintiff lacked the disclosure of Infuse/BMP-2's use in her surgeries and procedures.

279.    Plaintiff never received a verbal disclosure of Infuse/BMP-2 from Dr. Durrani, CAST staff and employees, Journey Lite personnel, or any West Chester/UC Health personnel.

280.    Medtronic specifically required Infuse/BMP-2 only be used in "skeletally mature patients" with degenerative disc disease.

281.    Medtronic required at least six (6) months of non-operative treatment prior to use of Infuse/BMP-2.

282.    Dr. Durrani regularly used Infuse/BMP-2 without this six (6) month non-operative treatment.

283.    Medtronic required BMP-2 always be used in conjunction with a metal LT cage.

284.    Dr. Durrani regularly used BMP-2 without a proper LT cage in her surgeries.

## PUREGEN

## PUREGEN BACKGROUND

285.    PureGen Osteoprogenitor Cell Allograft (PureGen) is a highly concentrated, pure population of Early Lineage Adult (ELA) stem cells that originates in bone marrow and is collected from live, healthy donors.

286.    PureGen is harvested from living human beings under the Stem Cell Collection Program administered by the Food and Drug Administration (FDA) and is defined as both a "biologic" by 42 U.S.C. 351(i) and a "drug" as defined by U.S.C. 321(g).

287.    PureGen's purpose was to facilitate bone fusion by mimicking the regenerative environment of youthful tissues by increasing the concentration of stem cells available to repair tissue and build bone.

288.    When used off-label, as Dr. Durrani often did, biologic bone allograft frequently causes excessive or uncontrolled (also referred to as "ectopic" or "exuberant") bone growth on or around the spinal cord.

289.    When nerves are compressed by such excessive bone growth, a patient can experience, among other adverse events, intractable pain, paralysis, spasms, and cramps in limbs.

290.    Alphatec Spine, Inc. is a corporation under the laws of California, and jointly developed and distributed PureGen in the State of Ohio.

291.    Alphatec Holdings, Inc. is a holding corporation formed under the laws of Delaware with no operations separate from the holding of other companies which owns Alphatec Spine, Inc.

292.    Dirk Kuyper was President and CEO of Alphatec Holdings, Inc. from February 2007 to August 2012.

293.    Parcell Laboratories, LLC is organized under the laws of Delaware and jointly developed

Puregen.

294.    Alphatec and Parcell co-developed the product "PureGen", and both expected PureGen

would be initially limited in application.

295.    PureGen is produced and distributed by Alphatec Spine, LLC, a division of Alphatec

Holdings.

296.    PureGen was entered into 3 clinical trials by Alphatec on or around February 9, 2011

which were scheduled to last until September of 2013.

297.    The study population were 50 male/female subjects 18 years and older suffering from

symptoms of cervical degenerative disc disease in one to four contiguous levels between C3 and

T1.

298.    The clinical trial required:

    a.    *Inclusion*

        i.    Age over 50

        ii.    Side-by-side use of Puregen and Autologous bone in the same

            patient for radiographic comparison

        iii.    Symptomatic lumbar degenerative disc disease in up to 2

            contiguous levels between L1 and S1

        iv.    Subjects with back and/or leg paint indicated for posterior

            stabilization with or without decompression at any level and

            posteriolateral fusion

        v.    Unresponsive to conservative treatment for at least 6 months

        vi.    Radiographic evidence of primary diagnosis

    b.    Exclusion:

        vii.    No healthy volunteers permitted

45

viii.      More than two levels requiring posteriolateral fusion (PLF)

ix.      Spondyliosis greater than Grade 1

x.      Prior failed fusion surgery at lumbar level(s)

xi.      Systemic or local infection in the disc or cervical spine, past or present

xii.      Active systemic disease

xiii.      Osteoporosis, Osteomalacia, or other metabolic bone disease that would significantly inhibit bone healing

xiv.      Use of other bone graft, Bone Morphogenic Protein (BMP), or bone graft substitutes in addition to or in place of those products specified

xv.      BMI greater than 40

xvi.      Use of post-operative spinal cord stimulator

xvii.      Known or suspected history of alcohol and/or drug abuse

xviii.      Involved in pending litigation or worker's compensation related to the spine

xix.      Pregnant or planning to become pregnant during the course of the study

xx.      Insulin-dependent diabetes mellitus

xxi.      Life expectancy less than duration of study

xxii.      Any significant psychological disturbance that could impair consent process or ability to complete self-assessment questionnaires

xxiii.      Undergoing chemotherapy or radiation treatment, or chronic use of oral or injected steroids or prolonged use of non-steroidal anti-inflammatory drugs

xxiv.     Known history of hypersensitivity or anaphylactic reaction to dimenthyl sulfoxide (DMSO).

299.    All 3 clinical trials were "Terminated" before any results were produced.

300.    Alphatec and Parcell saw this limited approval for clinical trials as an opportunity to market PureGen without premarket approval, 510K clearance, an exception to the Food Drug and Cosmetic Act, meeting the humanitarian device exception, investigational new drug (IND) application, or other permission to market PureGen, all in violation of the Food Drug and Cosmetic Act.

301.    Alphatec and Parcell began a course of conduct designed to expand the application of PureGen by end users in excess of the approved clinical trial of PureGen. This course of conduct utilized fraud, false statements, material misrepresentation, and deceit in order to broaden the sales of PureGen beyond that which the usual acceptance within the scientific community or regulatory approval would otherwise allow.

302.    The Food and Drug Administration (FDA) conducted an inspection of Parcell Laboratories between February 9-14, 2011.

303.    After the inspection, the FDA responded quickly to the unlicensed marketing of the device PureGen by warning that PureGen was not the subject of an IND application nor a valid biologics license with a letter dated June 23, 2011.

304.    The letter stated that the cells used in the production of PureGen were human cells, tissues, or cellular and tissue-based products (HCT/Ps) as defined in 21 CFR 1271.3(d).

305.    Based on this analysis, the FDA determined that PureGen was a drug and biological product as defined in the Federal Food, Drug and Cosmetic Act.

306.    According to the Public Health Service Act, a valid biologics license is also required to introduce a biologics device to the market.

47

307.    Alphatec Spine did not acquire a valid biologics license to enter a biologics product into interstate commerce, in violation of 21 U.S.C. 355(a); 42 U.S.C. 262(a).

308.    The FDA stated that PureGen, "does not meet all of the criteria in 21 CFR 1271.10(a) and therefore is not regulated solely under section 361 of the Public Health Service Act and the regulations in 21 CFR Part 1271. Specifically, the product does not meet the criterion in 21 CFR 1271.10(a)(4)(ii)(b) because the product is dependent on the metabolic activity of living cells for its primary function."

309.    As a result, a valid biologics license was required, which was never obtained by Alphatec or Parcell labs in regards to PureGen.  Defendants knew all this.

310.    Given this lack of a valid biologics license, the FDA determined that the marketing of PureGen violated both the Federal Food, Drug and Cosmetic Act and the Public Health Service Act.

311.    In a statement to the press approximately a week after receiving the FDA Letter, Alphatec President Dirk Kuyper stated, "Both Alphatec Spine and Parcell Laboratories are fully committed to work closely and collaboratively with the FDA to address the questions related to the PureGen Product. We look forward to discussing the PureGen product with the FDA and sharing our clinical outcomes to date." See article "Alphatec comments on FDA's letter regarding PureGen product for spinal fusion procedures", Spinal News International, July 28, 2011, attached as Exhibit E.

312.    No such cooperation by Alphatec and Parcell labs occurred and no clinical outcomes were shared with the FDA as all clinical trials of PureGen were "Terminated" and no data was released as to the findings.

313. In fact, Alphatec and Parcell responded to this letter by continuing to market PureGen in an unlicensed manner until Alphatec finally acknowledged the letter in or around February 2013, almost two years after receiving the letter, by stating it disagrees with the FDA's classification of PureGen as anything other than a tissue product – despite the clinical trial approval listing PureGen as "Biological: PureGen Osteoprogenitor Cell Allograft".

314. Furthermore, according to sales representative, Thomas Blank, Alphatec falsely informed distributors of PureGen that they "resolved" the issues addressed in the FDA letter, did not have to take PureGen off the market and it was "ok" for their distributors to continue marketing and selling PureGen.

315. Despite the approval for the clinical trial of PureGen which limited enrollment to 50 patients, Alphatec advertised in its 2012 Annual Report that PureGen had been implanted in over 3,500 patients.

316. PureGen further stated that it had been placed in these 3,500 patients with "no adverse events related to the product", despite no study, statistics or information to back up such a claim.

317. This 2012 annual report also identified PureGen as a biologic.

318. In the First Quarter of 2011, Alphatec Spine attributed part of its 40.9% increase in revenue to the PureGen product. See Becker's Spine Review, Alphatec Spine Reports $49.7M in Q1 Revenue, 40.9% Increase, May 5, 2011, attached as exhibit H.

319. Eventually, after PureGen had been unlawfully implanted in thousands of patients, Alphatec and Parcell conceded that PureGen is a tissue product and a biologic and stopped shipping PureGen in February of 2013.

**PUREGEN AND OHIO LAW**

320.     It is the position of the Deters Law Firm that the distribution and use of PureGen by Dr.

Durrani, Evolution Medical, Alphatec Spine, Inc., and West Chester/UC Health by Defendants is

in violation not only of Federal Law as outlined in the FDA's letter, but Ohio State Law as well.

321.     Ohio Revised Code 3715.65(A) states that "No person shall sell, deliver, offer for sale,

hold for sale, or give away any new drug unless an application with respect to the drug has

become effective under section 505 of the Federal Food, Drug and Cosmetic Act, 52 Stat. 1040

(1938), 21 U.S.C.A. 301". Defendants violated this provision.

322.     A "New Drug" is defined as "Any drug the composition of which is not generally

recognized among experts by scientific training and experience to evaluate the safety of drugs, as

safe for use under the conditions prescribed, recommended, or suggested in the labeling thereof."

Ohio Revised Code 3715.01(9)(a).

323.     PureGen's status as a Biologic further supports the classification of a drug under the FDA

and Ohio Law: "A "biological product" means a virus, therapeutic serum, toxin, antitoxin,

vaccine, blood, blood component or derivative, allergenic product, or analogous product, or

arsphenamine or derivative of arsphenamine (or any other trivalent organic arsenic compound),

applicable to the prevention, treatment, or cure of a disease or condition of human beings (Public

Health Service Act Sec. 351(i)). Additional interpretation of the statutory language is found in 21

CFR 600.3. Biological products also meet the definition of either a drug or device under Sections

201(g) and (h) of the Federal Food, Drug, and Cosmetic Act (FD&C Act)." See

http://www.fda.gov/ICECI/Inspections/IOM/ucm122535.htm.

324.    It is the position of the Deters Law Firm that PureGen is a drug as defined in ORC 3715.01 and that its distribution before FDA approval was in violation of ORC 3715.65(A). The Defendants with full knowledge and intent violated this statute.

## PUREGEN AT THE HOSPITALS

325.    On October 10, 2011, UC Health began purchasing PureGen from Alphatec. Thomas Blank was an employee of Innovative Medical Consultants, LLC and a sales representative, seller, marketer, and distributer of PureGen for the Northern Kentucky/Cincinnati area.

326.    In his professional capacity, Thomas Blank was present during most, if not all, of the surgeries at issue where PureGen was secretly implanted into various Plaintiffs without informed consent or permission.

327.    Thomas Blank worked directly with Alphatec Spine, Inc. and Defendants in the marketing and distribution of PureGen.

328.    Additionally, Thomas Blank is a shareholder in Alphatec Spine, Inc.

329.    On May 10, 2012 Evolution Medical, LLC, a physician owned distributorship (POD), owned in part (at least 40%) by Dr. Durrani and incorporated in Delaware, received a Kentucky Certificate of Authority.

330.    Around this time, Thomas Blank began to work with Evolution Medical in the marketing and distribution of PureGen, in addition to his dealing with Alphatec Spine, Inc.

331.    On July 20, 2012, UC Health with the full knowledge and consent of Defendants began purchasing PureGen from Evolution Medical, LLC.

332.    The purchase of PureGen, the logistics of the billing, the bills of lading, the receiving and handling of PureGen for West Chester Hospital was handled by UC Health Purchasing.

333.    The Defendants tracked West Chester/UC Health's purchases of PureGen from Evolution medical.

334.    Specifically, Thomas Blank would provide the materials from Alphatec related to the use and approval of PureGen to Dwayne Brown on behalf of UC Health, who would request PureGen based on the amounts requested by Dr. Durrani and other doctors who used the product.

335.    After the UC Health reps approved the use of PureGen, Thomas Blank and his associate Toby Wilcox would order the product, typically in bulk, and draft the requisite billing documents.

336.    The PureGen ordered would be stored on site at WCH in the freezer of the operating rooms.

337.    In addition to Dr. Durrani, other doctors at WCH used PureGen, including Dr. Chunduri, Dr. Curt and Dr. Shanti.

338.    Defendants would purchase and allow these doctors to use a substance not approved by the FDA in patients without their informed consent.

339.    Though WCH and UC Health do have patients fill out "informed consent" forms, no mention of PureGen or its non-FDA approved status is mentioned on these forms.

**DR. DURRANI AND PUREGEN**

340.    In one of the few depositions taken of Dr. Durrani before his flight from the country he stated that PureGen is "essentially stem cells" and that he "used to use [PureGen] for a certain amount of time." Deposition of Dr. Durrani in *Brenda Shell v. Durrani*, p. 25-26, attached as Exhibit N.

341.    This "certain amount of time" was approximately 3 years between 2010 and 2013, all while PureGen remained unapproved by the FDA.

52

342. Though downplaying his involvement with PureGen, Dr. Durrani, through his illegal POD Evolution Medical, distributed PureGen to West Chester/UC Health with the full knowledge and consent of Defendants.

343. Dr. Durrani and his Evolution Medical co-owner Toby Wilcox and Defendants, knew the Department of Health and Human Services and the United States Senate Finance Committee has released reports on dangers of Physician-owned entities, notably Physician-owned Distributorships (POD's).

344. Dr. Durrani and Toby Wilcox's actions through Evolution Medical violated the Anti-Kickback Statute 42 U.S.C. 1320 and Stark Law 42 U.S.C. 1395.

345. Compliance with the Anti-Kickback Statutes is a condition of receiving payment from a Federally-funded healthcare program, and most private insurers have a parallel conditional requirement.

346. The Anti-Kickback Statute prohibits the payment and receipt of kickbacks in return for either procuring or recommending the procurement of a good, facility, or item to be paid in whole or in part by a federal healthcare program. 42 U.S.C. 1320a-7b(b).

347. In violation of 45 C.F.R. 46, and in furtherance of the scheme to feign avoidance of the anti-kickback statutes, Dr. Durrani, CAST, Alphatec and the Defendants experimented on patients by using PureGen in unapproved manners, without the informed consent of the patients, and subsequently billing their health insurance companies all while concealing the true nature of their actions.

348. Dr. Durrani also had connections with Alphatec as his personal calendar indicates meetings with Dirk Kuyper, President and CEO of Alphatec in 2008.

53

349. Dr. Durrani experimentally used Puregen bone graft in twenty cervical surgeries, along with as many as 72 thoracic, cervical, and lumbar surgeries, ignoring the limited uses it was approved for in the clinical trials.

350. Dr. Durrani, through his POD Evolution Medical, was essentially "double dipping" in his dealings with PureGen.

351. Dr. Durrani would sell WCH and the other hospitals the PureGen through Evolution Medical and then use and bill for the PureGen in his surgeries.

352. Dr. Durrani and Defendants knew such an arrangement was either unethical and illegal (though still not disclosing the use of PureGen) by having the patients sign an Acknowledgement of Potential Conflict of Interest form.

353. WCH and Defendant also benefited from this arrangement by up charging patients for the PureGen after purchasing it from Evolution Medical and Dr. Durrani.

354. At all times relevant, Dr. Durrani and Defendants was in exclusive control of the amount and ratio of Puregen bone graft that was experimentally implanted into patients.

355. PureGen was and remains unapproved by the FDA for use in humans without an Investigation New Drug ("IND") or experimental informed consent of the patient.

356. Dr. Durrani and Defendants did not receive experimental informed consent from patients, nor did he verify that an IND was obtained.

357. The basic "Informed Consent Forms" Dr. Durrani and CAST did have patients fill out made no mention of PureGen or the fact a non-FDA approved product was being implanted in their body.

358.    In fact, Dr. Durrani and Defendants would even conceal the use of PureGen by intentionally withholding it from the billing records, noting on one Pre-Op Code sheet "Do Not Bill" twice in regards to PureGen.

359.    Implanting Puregen in any part of the spinal canal without FDA clearance, proper trials, and patient consent is reckless battery and violates the Hippocratic Oath's statement "I will prescribe regimens for the good of my patients according to my ability and my judgment and never **do harm** to anyone."  It is criminal.

## PUREGEN AND OUR CLIENTS

360.    What follows are just a few examples of the damage caused Dr. Durrani and the Defendants deceptive and fraudulent use of PureGen in Deters Law Office clients without their consent.

361.    A majority of these surgeries occurred AFTER the FDA inspection and subsequent warning on the non-FDA approved status of PureGen.

362.    Following the cervical surgeries in which Puregen was implanted, the patients' pain became far worse and more extreme.

363.    The patients attest to difficulty with swallowing unthickened liquid, medications in pill form, routine saliva, and food.

364.    Many patients describe a choking sensation felt on a daily basis when swallowing and changes to the tone and audibility of their voice, along with a chronic cough.

365.    Following the thoracic and lumbar surgeries, patients attest to increased spinal pain, difficulty with ambulation, numbness and tingling in lower extremities, decreased flexibility.

366.    Below are some of the clients experiences since having the Puregen implanted:

367. "I have severe low back pain, stiffness, decreased range of motion and tenderness. Pain radiating to left posterior thigh and right/left lumbar area. Onset months ago after surgery." – William Hayes

368. "Constant, irritating pain, less intense but still present. Even after two surgeries, I continue to have limited use of my left leg. The pain is ever-present. I am easily fatigued and have severe pain after brief tasks such as cooking dinner, preaching a sermon, even making a bed. Bending over is so painful and produces such instability that my family helps put on my socks and shoes. I require a cane for ambulation, due to left leg weakness and limited range of motion." – Darrell Earls

369. "Severe spin in my neck, arm, shoulder blades. Pressure on my throat making it unbearable to swallow meds and food. Loss of range of motion in my neck and stiffness in back. The pain is so severe that I can no longer sleep laying down. I have to sleep sitting up. The pain in my neck is unbearable most days. The pain runs between my shoulder blades into my chest and in my throat and side of my neck." - Duane Pelfrey

370. "I feel I have lost a lot of the flexibility in my neck and back. I have lower back pain, tightness in neck and shoulders, and have a hard time lifting/standing for long periods of time. When I bend over, I have a hard time straightening back up to an upright position." - Dana Conley

371. "Low back pain radiating into bilateral hips, buttocks, legs and feet. Bilateral leg weakness. Numbness in left foot and toes. Bilateral buttock and posterior thigh muscle spasms. Burning sensation in right abdomen that radiates around to back. My post-surgery MRI and CT scan showed bony overgrowth into the foramen and into the canal on left at L5-S1." - Julie Martin

372. "I experience pounding headaches that are far worse than anything prior to surgery. Left leg is numb, painful and swollen, muscle spasms occurring in hip and bilateral legs since surgeries with Dr. Durrani. My whole back, neck and leg hurt so bad I could throw up." - Tonia McQueary

373. "I have much more pain. Constant right-sided headache, intensity varies but always present. The back of my neck swells. My esophagus feels like it is in a different place. My throat swells." – Kelly Hennessey

374. As stated, there are just a few examples of clients that have been discovered to have had non-FDA approved PureGen implanted into their bodies without their informed consent, in violation of both Federal and State Law, all with the knowledge of Defendants.

## PUREGEN

375. Dr. Durrani oftentimes used Puregen when performing surgeries.

376. Puregen is a product produced by Alphatec Spine.

377. Dr. Durrani was and is a paid consultant for Alphatec Spine.

378. Dr. Durrani has an ownership stake in the Alphatec Spine.

379. Puregen has never been approved by the FDA for any human use.

380. Puregen is now removed from the market for any use.

381. Dr. Durrani used the product Puregen as bone graft substitute similar to Infuse/BMP-2 during spinal surgeries.

382. Dr. Durrani, CAST staff and employees, Journey Lite personnel, and West Chester/UC Health personnel did not disclose their intent to use Puregen, nor did they inform Plaintiffs that it was a product that was not approved by the FDA for human use.

383. Dr. Durrani used Puregen in Plaintiff in manners not approved by the FDA.

384. Plaintiffs were not informed by Dr. Durrani, CAST staff and employees, Journey Lite personnel, or any West Chester/UC Health personnel that Dr. Durrani used Puregen in Plaintiff's surgeries.

385. Plaintiff would not have allowed Puregen to be used by Dr. Durrani in her surgeries in a manner that was not approved by the FDA.

386. Plaintiff would not have consented to the use of Puregen in her body if informed of the risks by Dr. Durrani, CAST staff and employees, Journey Lite personnel, or any West Chester/UC Health personnel.

387. The written informed consent of Dr. Durrani and CAST signed by Plaintiff lacked the disclosure of Puregen's use in her procedures.

388. Plaintiff never received a verbal disclosure of Puregen from Dr. Durrani, CAST staff and employees, or any West Chester/UC Health Personnel.

### DR. DURRANI COUNTS:

### COUNT 1: NEGLIGENCE

389. Defendant Dr. Durrani owed his patient, Plaintiff, the duty to exercise the degree of skill, care, and diligence an ordinarily prudent health care provider would have exercised under like or similar circumstances.

390. Defendant Dr. Durrani breached his duty by failing to exercise the requisite degree of skill, care and diligence that an ordinarily prudent health care provider would have exercised under same or similar circumstances through, among other things, negligent diagnosis, medical mismanagement and mistreatment of Plaintiffs, including but not limited to improper selection for surgery, improper performance of the surgeries, and improper follow-up care addressing a patient's concerns.

58

391.    As a direct and proximate result of the aforementioned negligence and deviation from the standard of care on the part of the Defendant Dr. Durrani, Plaintiffs sustained all damages requested in the prayer for relief.

## COUNT II: BATTERY

392.    Dr. Durrani committed battery against Plaintiff by performing surgeries that were unnecessary, contraindicated for Plaintiff's medical condition, and for which he did not properly obtain informed consent, inter alia, by using Infuse/BMP-2, PureGen and/or Baxano in ways and for surgeries not approved by the FDA and medical community, and by the failure to provide this information to Plaintiff.

393.    Plaintiff would not have agreed to the surgeries if she knew the surgeries were unnecessary, not approved by the FDA, and not indicated.

394.    As a direct and proximate result of the aforementioned battery by Dr. Durrani, Plaintiffs sustained all damages requested in the prayer for relief.

## COUNT III: LACK OF INFORMED CONSENT

395.    The informed consent forms from Dr. Durrani and CAST, which they required Plaintiff to sign, failed to fully cover all the information necessary and required for the surgical procedures performed by Dr. Durrani.  Dr. Durrani and CAST each required an informed consent release.

396.    In addition, no one verbally informed Plaintiff of the information and risks required for informed consent at the time of or before the Plaintiff's surgeries.

397.    Dr. Durrani failed to inform Plaintiff of material risks and dangers inherent or potentially involved with her surgeries and procedures.

59

406.    These misrepresentations and/or concealments were material to Plaintiff because they directly induced the Plaintiff to undergo her surgeries.

407.    Dr. Durrani knew or should have known such representations were false, and/or made the misrepresentations with utter disregard and recklessness as to their truth that knowledge of their falsity may be inferred.

408.    Dr. Durrani made the misrepresentations before, during, and after the surgeries, with the intent of misleading Plaintiff and her insurance company into relying upon them. Specifically, the misrepresentations were made to induce payment by the insurance company, without which Dr. Durrani would not have performed the surgeries, and to induce Plaintiff to undergo the surgeries without regard to medical necessity and only for the purpose of receiving payment.

409.    The misrepresentations and/or concealments were made during the Plaintiff's office visits at Dr. Durrani's CAST offices and/or at West Chester Hospital/UC Health.

410.    Plaintiff was justified in her reliance on the misrepresentations because a patient has a right to trust their doctor and that the facility is overseeing the doctor to ensure the patients of that doctor can trust the facility.

411.    As a direct and proximate result of the aforementioned fraud, Plaintiff did undergo surgeries, which was paid for in whole or in part by her insurance company, and suffered all damages requested in the prayer for relief.

## COUNT VI: SPOLIATION OF EVIDENCE

412.    Dr. Durrani willfully altered, destroyed, delayed, hid, modified and/or spoiled ("spoiled") Plaintiff's records, billing records, emails, paperwork and related evidence.

413.    Dr. Durrani spoiled evidence with knowledge that there was pending or probable litigation involving Plaintiff.

61

414.    Dr. Durrani's conduct was designed to disrupt Plaintiff's potential and/or actual case, and did in fact and proximately cause disruption, damages and harm to Plaintiff.

## COUNT VII: LOSS OF CONSORTIUM

415.    At all times relevant, the Plaintiffs were married.

416.    As a result of the wrongful acts and omissions of Dr. Durrani, Plaintiffs were caused to suffer, and will continue to suffer in the future, loss of consortium, loss of society, loss of affection, loss of assistance, and loss of conjugal fellowship, all to the detriment of Plaintiffs' marital relationship.

417.    All the aforesaid injuries and damages were caused proximately by the acts and omissions of Dr. Durrani.

## CAST COUNTS:

## COUNT I: VICARIOUS LIABILITY

418.    At all times relevant, Defendant Dr. Durrani was an agent, and/or employee of CAST.

419.    Dr. Durrani is in fact, the owner of CAST.

420.    Defendant Dr. Durrani was performing within the scope of his employment with CAST during the care and treatment of Plaintiff.

421.    Defendant CAST is responsible for harm caused by acts of its employees for conduct that was within the scope of employment under the theory of respondeat superior.

422.    Defendant CAST is vicariously liable for the acts of Defendant Dr. Durrani alleged in this Complaint including all of the counts asserted against Dr. Durrani directly.

423.    As a direct and proximate result of Defendant CAST's acts and omissions, Plaintiff sustained all damages requested in the prayer for relief.

## COUNT II: NEGLIGENT HIRING, RETENTION & SUPERVISION

424. CAST provided Dr. Durrani, inter alia, financial support, control, medical facilities, billing and insurance payment support, staff support, medicines, and tangible items for use on patients.

425. CAST and Dr. Durrani participated in experiments using Infuse/BMP-2 and/or Puregen bone graft on patients, including Plaintiff, without obtaining proper informed consent thereby causing harm to Plaintiff.

426. CAST breached its duty to Plaintiffs, inter alia, by not supervising or controlling the actions of Dr. Durrani and the doctors, nurses, staff, and those with privileges, during the medical treatment of Plaintiff at CAST.

427. The Safe Medical Device Act required entities such as CAST to report serious injuries, serious illnesses, and deaths related to failed medical devices to the FDA and the manufacturer; this was never done.

428. Such disregard for and violations of federal law represents strong evidence that CAST negligently hired, retained and supervised Dr. Durrani.

429. As a direct and proximate result of the acts and omissions herein described, including but not limited to failure to properly supervise medical treatment by Dr. Durrani, Plaintiff sustained all damages requested in the prayer for relief.

## COUNT III: FRAUD

430. CAST sent out billing to Plaintiff at her home following her surgeries at West Chester Hospital/UC Health and Journey Lite.

431. The exact dates these medical bills were sent out are reflected in those medical bills.

63

432.    These bills constituted affirmative representations by CAST that the charges related to Plaintiff's surgeries were medically appropriate and properly documented.

433.    The bills were sent with the knowledge of CAST that in fact Plaintiff's surgeries were not appropriately billed and documented and that the services rendered at West Chester Hospital/UC Health and Journey Lite associated with Dr. Durrani were not appropriate.

434.    The bills sent by CAST to Plaintiff falsely represented that Plaintiff's surgeries were appropriately indicated, performed and medically necessary in contra-indication of the standard of care.

435.    Plaintiffs relied on the facility holding Dr. Durrani out as a surgeon and allowing him to perform surgeries at its health care facility as assurance the facility was overseeing Dr. Durrani, vouching for his surgical abilities, and further was appropriately billing Plaintiffs for CAST's services in association with Dr. Durrani's surgery.

436.    As a direct and proximate result of this reliance on the billing of CAST, Plaintiff incurred medical bills that she otherwise would not have incurred.

437.    CAST also either concealed from Plaintiff that they knew about Dr. Durrani, including that Infuse/BMP-2 and/or Puregen would be used in Plaintiff's surgeries, or misrepresented to Plaintiff the nature of the surgeries, and the particular risks that were involved therein.

438.    CAST's concealments and misrepresentations regarding Infuse/BMP-2 and/or Puregen and the nature and risks of Plaintiff's surgeries were material facts.

439.    Because of its superior position and professional role as a medical service provider, CAST had a duty to disclose these material facts to Plaintiff and a duty to refrain from misrepresenting such material facts to Plaintiff.

440.    CAST intentionally concealed and/or misrepresented said material facts with the intent to defraud Plaintiff in order to induce Plaintiff to undergo the surgeries, and thereby profited from the surgeries and procedures Dr. Durrani performed on Plaintiff at West Chester Hospital/UC Health and Journey Lite.

441.    Plaintiff was unaware that BMP-2 and/or Puregen would be used in Plaintiff's surgeries and therefore, was unaware of the health risks of Infuse/BMP-2 and/or Puregen's use in Plaintiff's spine.

442.    Had Plaintiff known before Plaintiff's surgeries that Infuse/BMP-2 and/or Puregen would be used in Plaintiff's spine and informed of the specific, harmful risks flowing therefrom, Plaintiff would not have undergone the surgeries with Dr. Durrani at West Chester Hospital/UC Health and Journey Lite.

443.    Plaintiffs are still awaiting itemized billing from CAST with the exact totals of Plaintiff's surgeries. Upon information and belief, Plaintiff believes that the itemized billing will show that Infuse/BMP-2 and/or Puregen was used in Plaintiff's surgeries.

444.    As a direct and proximate result of the fraud against Plaintiffs by CAST, Plaintiffs sustained all damages requested in the prayer for relief.

## COUNT IV: OHIO CONSUMER SALES PROTECTION ACT

445.    Although the Ohio Consumer Sales Protection statutes O.R.C 1345.01 et seq. exempts physicians, a transaction between a hospital and a patient/consumer is not clearly exempted.

446.    CAST's services rendered to Plaintiffs constitute a "consumer transaction" as defined in ORC Section 1345.01(A).

447.    CAST omitted suppressed and concealed from Plaintiffs facts with the intent that Plaintiffs rely on these omissions, suppressions and concealments as set forth herein.

65

448.    CAST's misrepresentations, and its omissions, suppressions and concealments of fact, as described above, constituted unfair, deceptive and unconscionable acts and practices in violation of O.R.C 1345.02 and 1345.03 and to Substantive Rules and case law.

449.    CAST was fully aware of its actions.

450.    CAST was fully aware that Plaintiffs were induced by and relied upon CAST's representations at the time CAST was engaged by Plaintiffs.

451.    Had Plaintiffs been aware that CAST's representations as set forth above were untrue, Plaintiffs would not have used the services of Defendants.

452.    CAST, through its agency and employees knowingly committed the unfair, deceptive and/or unconscionable acts and practices described above.

453.    CAST's actions were not the result of any bona fide errors.

454.    As a result of CAST's unfair, deceptive and unconscionable acts and practices, Plaintiffs have suffered and continues to suffer damages, which include, but are not limited to the following:

    a.    Loss of money paid

    b.    Severe aggravation and inconveniences

    c.    Under O.R.C. 1345.01 Plaintiff is entitled to:

        i.    An order requiring CAST restore to Plaintiffs all money received from Plaintiff plus three times actual damages and/or actual/statutory damages for each violation;

        ii.   All incidental and consequential damages incurred by Plaintiffs;

        iii.  All reasonable attorneys' fees, witness fees, court costs and other fees incurred;

        iv.   Such other and further relief that this Court deems just and appropriate.

## COUNT V: SPOLIATION OF EVIDENCE

455.　CAST, through its agents and employees, willfully altered, destroyed, delayed, hid, modified and/or spoiled ("spoiled") Plaintiff's records, billing records, emails, paperwork and related evidence.

456.　CAST, through its agents and employees, spoiled evidence with knowledge that there was pending or probable litigation involving Plaintiff.

457.　CAST's conduct was designed to disrupt Plaintiff's potential and/or actual case, and did in fact and proximately cause disruption, damages and harm to Plaintiff.

## COUNT VI: LOSS OF CONSORTIUM

458.　At all times relevant, the Plaintiffs were married.

459.　As a result of the wrongful acts and omissions of CAST, Plaintiffs were caused to suffer, and will continue to suffer in the future, loss of consortium, loss of society, loss of affection, loss of assistance, and loss of conjugal fellowship, all to the detriment of Plaintiffs' marital relationship.

460.　All the aforesaid injuries and damages were caused proximately by the acts and omissions of CAST.

## WEST CHESTER HOSPITAL/UC HEALTH COUNTS:

## COUNT I: NEGLIGENCE

461.　West Chester Hospital/UC Health owed their patient, Plaintiffs, through its agents and employees the duty to exercise the degree of skill, care, and diligence an ordinarily prudent health care provider would have exercised under like or similar circumstances.

462.　West Chester Hospital/UC Health acting through its agents and employees breached their duty by failing to exercise the requisite degree of skill, care and diligence that an ordinarily

prudent health care provider would have exercised under same or similar circumstances through, among other things, negligent diagnosis, medical mismanagement and mistreatment of Plaintiff, including but not limited to improper selection for surgeries, improper performance of the surgery, improper assistance during Plaintiff's surgeries and improper follow up care addressing a patient's concerns.

463. The agents and employees who deviated from the standard of care include nurses, physician assistants, residents and other hospital personnel who participated in Plaintiff's surgeries.

464. The management, employees, nurses, technicians, agents and all staff during the scope of their employment and/or agency of West Chester Hospital/UC Health's knowledge and approval, either knew or should have known the surgeries were not medically necessary based upon Dr. Durrani's known practices; the pre-op radiology; the pre-op evaluation and assessment; and the violation of their responsibility under the bylaws, rules, regulations and policies of West Chester Hospital/UC Health.

465. As a direct and proximate result of the aforementioned negligence and deviation from the standard of care by the agents and employees of West Chester Hospital/UC Health, Plaintiffs sustained all damages requested in the prayer for relief.

## COUNT II: NEGLIGENT CREDENTIALING, SUPERVISION, & RETENTION

466. As described in the Counts asserted directly against Dr. Durrani, the actions of Dr. Durrani with respect to Plaintiff constitute medical negligence, lack of informed consent, battery, and fraud.

467. West Chester Hospital/UC Health negligently credentialed, supervised, and retained Dr. Durrani as a credentialed physician by:

68

a. Violating their JCAHO rules by allowing Dr. Durrani to repeatedly violate the West Chester Hospital/UC Health bylaws with it's full knowledge of the same;

b. Failing to adequately review, look into, and otherwise investigate Dr. Durrani's educational background, work history and peer reviews when he applied and reapplied for privileges at West Chester Hospital;

c. Ignoring complaints about Dr. Durrani's treatment of patients reported to it by West Chester Hospital staff, doctors, Dr. Durrani's patients and by others;

d. Ignoring information they knew or should have known pertaining to Dr. Durrani's previous privileged time at other Cincinnati area hospitals, including Children's Hospital, University Hospital, Deaconess Hospital, Good Samaritan Hospital and Christ Hospital.

468. The Safe Medical Device Act required entities such as West Chester Hospital/UC Health to report serious injuries, serious illnesses, and deaths related to failed medical devices to the FDA and the manufacturer; this was never done.

469. As a direct and proximate result of the negligent credentialing, supervision, and retention of Dr. Durrani, Plaintiffs sustained all damages requested in the prayer for relief.

## COUNT III: FRAUD

470. West Chester Hospital/UC Health sent out billing to Plaintiff at her home following her surgeries at West Chester Hospital.

471. The exact dates these medical bills were sent out are reflected in those medical bills.

472. These bills constituted affirmative representations by West Chester Hospital/UC Health that the charges related to Plaintiff's surgeries were medically appropriate and properly documented.

473.    The bills were sent with the knowledge of West Chester Hospital/UC Health that in fact Plaintiff's surgeries were not appropriately billed and documented and that the services rendered at West Chester Hospital/UC Health associated with Dr. Durrani were not appropriate.

474.    The bills sent by West Chester Hospital/UC Health to Plaintiff falsely represented that Plaintiff's surgery was appropriately indicated, performed and medically necessary in contra-indication of the standard of care.

475.    Plaintiffs relied on the facility holding Dr. Durrani out as a surgeon and allowing him to perform surgeries at its health care facility as assurance the facility was overseeing Dr. Durrani, vouching for his surgical abilities, and further was appropriately billing Plaintiffs for West Chester Hospital/UC Health's services in association with Dr. Durrani's surgeries.

476.    As a direct and proximate result of this reliance on the billing of West Chester Hospital/UC Health, Plaintiff incurred medical bills that she otherwise would not have incurred.

477.    West Chester Hospital/UC Health also either concealed from Plaintiff that they knew about Dr. Durrani, including that Infuse/BMP-2 and/or Puregen would be used in Plaintiff's surgeries, or misrepresented to Plaintiff the nature of the surgeries and the particular risks that were involved therein.

478.    West Chester Hospital/UC Health's concealments and misrepresentations regarding Infuse/BMP-2 and/or Puregen and the nature and risks of Plaintiff's surgeries were material facts.

479.    Because of its superior position and professional role as a medical service provider, West Chester Hospital/UC Health had a duty to disclose these material facts to Plaintiffs and a duty to refrain from misrepresenting such material facts to Plaintiffs.

480.    West Chester Hospital/UC Health intentionally concealed and/or misrepresented said

material facts with the intent to defraud Plaintiff in order to induce Plaintiff to undergo the

surgeries, and thereby profited from the surgeries and procedures Dr. Durrani performed on

Plaintiff at West Chester Hospital/UC Health. Plaintiffs have attached their medical bills from

West Chester Hospital/UC Health indicating the fraudulent charges. West Chester Hospital/UC

Health bills are attached.

481.    Plaintiff was unaware that Infuse/BMP-2 and/or Puregen would be used in Plaintiff's

surgeries and therefore, was unaware of the health risks of Infuse/BMP-2 or Puregen's use in

Plaintiff's spine.

482.    Had Plaintiff known before Plaintiff's surgery that Puregen would be used in Plaintiff's

spine and informed of the specific, harmful risks flowing therefrom, Plaintiff would not have

undergone the surgeries with Dr. Durrani at West Chester Hospital/UC Health.

483.    Plaintiffs are still awaiting itemized billing from CAST with the exact totals of Plaintiff's

surgeries. Upon information and belief, Plaintiff believes that the itemized billing will show that

Infuse/BMP-2 and/or Puregen was used in Plaintiff's surgeries.

484.    As a direct and proximate result of the fraud upon Plaintiffs by West Chester

Hospital/UC Health, Plaintiff sustained all damages requested in the prayer for relief.

### COUNT IV: OHIO CONSUMER SALES PROTECTION ACT

485.    Although the Ohio Consumer Sales Protection statutes O.R.C 1345.01 et seq. exempts

physicians, a transaction between a hospital and a patient/consumer is not clearly exempted.

486.    West Chester Hospital/UC Health's services rendered to Plaintiff constitute a "consumer

transaction" as defined in ORC Section 1345.01(A).

71

487.    West Chester Hospital/UC Health omitted suppressed and concealed from Plaintiffs facts with the intent that Plaintiffs rely on these omissions, suppressions and concealments as set forth herein.

488.    West Chester Hospital/UC Health's misrepresentations, and its omissions, suppressions and concealments of fact, as described above, constituted unfair, deceptive and unconscionable acts and practices in violation of O.R.C 1345.02 and 1345.03 and to Substantive Rules and case law.

489.    West Chester Hospital/UC Health was fully aware of its actions.

490.    West Chester Hospital/UC Health was fully aware that Plaintiffs were induced by and relied upon West Chester Hospital/UC Health's representations at the time West Chester Hospital/UC Health was engaged by Plaintiffs.

491.    Had Plaintiffs been aware that West Chester Hospital/UC Health's representations as set forth above were untrue, Plaintiffs would not have used the services of Defendants.

492.    West Chester Hospital/UC Health, through its agency and employees knowingly committed the unfair, deceptive and/or unconscionable acts and practices described above.

493.    West Chester Hospital/UC Health 's actions were not the result of any bona fide errors.

494.    As a result of West Chester Hospital/UC Health's unfair, deceptive and unconscionable acts and practices, Plaintiffs have suffered and continues to suffer damages, which include, but are not limited to the following:

      d.  Loss of money paid

      e.  Severe aggravation and inconveniences

      f.  Under O.R.C. 1345.01 Plaintiff is entitled to:

     i.   An order requiring West Chester Hospital/UC Health restore to Plaintiffs all money received from Plaintiffs plus three times actual damages and/or actual/statutory damages for each violation;

    ii.   All incidental and consequential damages incurred by Plaintiffs;

    iii.   All reasonable attorneys' fees, witness fees, court costs and other fees incurred;

    iv.   Such other and further relief that this Court deems just and appropriate.

## COUNT V: PRODUCTS LIABILITY

495.    At all times Infuse/BMP-2 and Puregen are and were products as defined in R.C. § 2307.71(A)(12) and applicable law.

496.    West Chester Hospital/UC Health (aka supplier) supplied either Medtronic's (aka manufacturer) Infuse/BMP-2 for surgery performed by Dr. Durrani on Plaintiff.

497.    West Chester Hospital/UC Health, as a supplier, failed to maintain Infuse/BMP-2 properly.

498.    West Chester Hospital/UC Health did not adequately supply all components required to use either Infuse/BMP-2 properly.

499.    West Chester Hospital/UC Health knew or should have known the FDA requirements and Medtronic's requirements for using either Infuse/BMP-2.

500.    West Chester Hospital/UC Health stored either Infuse/BMP-2 at its facility.

501.    West Chester Hospital/UC Health ordered either Infuse/BMP-2 for surgery performed by Durrani.

502.    West Chester Hospital/UC Health did not adequately warn Plaintiff that Infuse/BMP-2 would be used without all FDA and manufacturer required components.

73

503.    West Chester Hospital/UC Health did not gain informed consent from Plaintiff for the use of Infuse/BMP-2, let alone warn of the supplying of the product without FDA and manufacturer requirements.

504.    West Chester Hospital/UC Health failed to supply either Infuse/BMP-2 (aka product) in the manner in which it was represented.

505.    West Chester Hospital/UC Health failed to provide any warning or instruction in regard to Infuse/BMP-2, and failed to make sure any other party gave such warning or instruction.

506.    Plaintiffs suffered physical, financial, and emotional harm due to West Chester Hospital/UC Health's violation of the Ohio Products Liability act. Plaintiff's injuries were a foreseeable risk

507.    Plaintiff did not alter, modify or change the product, nor did Plaintiff know that the product was being implanted without all required components.

508.    West Chester Hospital/UC Health knew or should have known that the product was extremely dangerous and should have exercised care to provide a warning that the product was being used and that the product was being used outside FDA and manufacturer requirements. The harm caused to Plaintiff by not providing an adequate warning was foreseeable.

509.    West Chester Hospital/UC Health knew that the product did not conform to the representation of the intended use by the manufacturer yet permitted the product to be implanted into Plaintiff.

510.    West Chester Hospital/UC Health, as a supplier, acted in an unconscionable manner in failing to supply the product without all FDA and manufacturer required components.

74

511.    West Chester Hospital/UC Health, as a supplier, acted in an unconscionable manner in failing to warn Plaintiffs that the product was being supplied without all FDA and manufacturer required components.

512.    West Chester Hospital/UC Health 's actions demonstrate they took advantage of the Plaintiffs inability, due to ignorance of the product, to understand the product being implanted without FDA and manufacturer required components.

513.    West Chester Hospital/UC Health substantially benefited financially by the use of the product as the product allowed for Defendant to charge more for the surgery.

514.    Plaintiffs suffered economic loss as defined in R.C. § 2303.71(A)(2) and applicable law.

515.    Plaintiffs suffered mental and physical harm due to West Chester Hospital/UC Health's acts and omissions.

516.    Plaintiffs suffered emotional distress due to acts and omissions of West Chester Hospital/UC Health and are entitled to recovery as defined in R.C, § 2307.71(A)(7) and applicable law.

517.    West Chester Hospital/UC Health violated the Ohio Products Liability Act R.C. § 2307.71-2307.80

518.    West Chester Hospital/UC Health violated R.C. § 2307.71(A)(6).

519.    West Chester Hospital/UC Health violated The Ohio Consumer Sales Practices Act R.C. § 1345.02-.03.

520.    West Chester Hospital/UC Health provided inadequate warnings are defined in R.C, § 2307.76(A) and applicable law.

## COUNT VI: SPOLIATION OF EVIDENCE

521.    West Chester Hospital/UC Health through its agents and employees, willfully altered, destroyed, delayed, hid, modified and/or spoiled ("spoiled") Plaintiff's records, billing records, emails, paperwork and related evidence.

522.    West Chester Hospital/UC Health through its agents and employees, spoiled evidence with knowledge that there was pending or probable litigation involving Plaintiff.

523.    West Chester Hospital/UC Health's conduct was designed to disrupt Plaintiff's potential and/or actual case, and did in fact and proximately cause disruption, damages and harm to Plaintiff.

## COUNT VII: LOSS OF CONSORTIUM

524.    At all times relevant, the Plaintiffs were married.

525.    As a result of the wrongful acts and omissions of West Chester Hospital/UC Health, Plaintiffs were caused to suffer, and will continue to suffer in the future, loss of consortium, loss of society, loss of affection, loss of assistance, and loss of conjugal fellowship, all to the detriment of Plaintiffs' marital relationship.

526.    All the aforesaid injuries and damages were caused proximately by the acts and omissions of West Chester Hospital/UC Health.

## JOURNEY LITE, LLC COUNTS:

## COUNT I: NEGLIGENCE

527.    Journey Lite owed their patient, Plaintiffs, through its agents and employees the duty to exercise the degree of skill, care, and diligence an ordinarily prudent health care provider would have exercised under like or similar circumstances.

528.    Journey Lite acting through its agents and employees breached their duty by failing to exercise the requisite degree of skill, care and diligence that an ordinarily prudent health care

76

provider would have exercised under same or similar circumstances through, among other things, negligent diagnosis, medical mismanagement and mistreatment of Plaintiff, including but not limited to improper selection for surgeries, improper performance of the surgery, improper assistance during Plaintiff's surgeries and improper follow up care addressing a patient's concerns.

529.    The agents and employees who deviated from the standard of care include nurses, physician assistants, residents and other hospital personnel who participated in Plaintiff's surgeries.

530.    The management, employees, nurses, technicians, agents and all staff during the scope of their employment and/or agency of Journey Lite's knowledge and approval, either knew or should have known the surgeries were not medically necessary based upon Dr. Durrani's known practices; the pre-op radiology; the pre-op evaluation and assessment; and the violation of their responsibility under the bylaws, rules, regulations and policies of Journey Lite.

531.    As a direct and proximate result of the aforementioned negligence and deviation from the standard of care by the agents and employees of Journey Lite, Plaintiffs sustained all damages requested in the prayer for relief.

## COUNT II: NEGLIGENT CREDENTIALING, SUPERVISION, & RETENTION

532.    As described in the Counts asserted directly against Dr. Durrani, the actions of Dr. Durrani with respect to Plaintiff constitute medical negligence, lack of informed consent, battery, and fraud.

533.    Journey Lite negligently credentialed, supervised, and retained Dr. Durrani as a credentialed physician by:

> e.  Violating their JCAHO rules by allowing Dr. Durrani to repeatedly violate the Journey Lite bylaws with it's full knowledge of the same;

77

     f.   Failing to adequately review, look into, and otherwise investigate Dr. Durrani's educational background, work history and peer reviews when he applied and reapplied for privileges at Journey Lite;

     g.   Ignoring complaints about Dr. Durrani's treatment of patients reported to it by Journey Lite staff, doctors, Dr. Durrani's patients and by others;

     h.   Ignoring information they knew or should have known pertaining to Dr. Durrani's previous privileged time at other Cincinnati area hospitals, including Children's Hospital, University Hospital, Deaconess Hospital, Good Samaritan Hospital and Christ Hospital.

534.   The Safe Medical Device Act required entities such as Journey Lite to report serious injuries, serious illnesses, and deaths related to failed medical devices to the FDA and the manufacturer; this was never done.

535.   As a direct and proximate result of the negligent credentialing, supervision, and retention of Dr. Durrani, Plaintiffs sustained all damages requested in the prayer for relief.

### COUNT III: FRAUD

536.   Ohio Administrative Code 3701-83-07(A)(5) states, "Each patient shall receive, if requested, a detailed explanation of facility charges including an itemized bill for services rendered.

537.   The bills sent to Plaintiff, after multiple requests, were in violation Ohio Administrative Code 3701-83-07(A)(5).

538.   Upon information and belief Plaintiff believes, based off of Plaintiff's Operative Report Records, BMP-2 was used as well as Puregen in both of Plaintiff's surgeries. (See Exhibit B, C and D)

539.   Even after Plaintiff's Counsel and the Ohio Attorney General requested itemized billing, Journey Lite still did not provide an itemized breakdown of the charges; instead Journey Lite

continued to provide "Account Ledgers," which contained barebones "Insurance Billing" and "Insurance Payments."

540.    Due to Journey Lite's downright refusal to comply with Plaintiff's request for itemized billing, Plaintiff has been forced to file a class action suit against Journey Lite's for their egregious billing practices.

541.    The bills sent by Journey Lite to Plaintiff falsely represented that Plaintiff's surgeries were appropriately indicated, performed, and medically necessary in contra-indication of the standard of care.

542.    Plaintiff relied on the facility holding Dr. Durrani out as a surgeon and allowing him to perform surgeries at its health care facility as assurance the facility was overseeing Dr. Durrani, vouching for his surgical abilities, and further was appropriately billing Plaintiff for Journey Lite's services in association with Dr. Durrani's surgeries.

543.    As a direct and proximate result of this reliance on the billing of Journey Lite, Plaintiff incurred medical bills that she otherwise would not have incurred.

544.    Journey Lite also either concealed from Plaintiff facts they knew about Dr. Durrani, including that Infuse/BMP-2 or Puregen would be used in Plaintiff's surgery, or misrepresented to Plaintiff the nature of the surgery, and the particular risks that were involved therein.

545.    Journey Lite's concealments and misrepresentations regarding Infuse/BMP-2 and Puregen and the nature and risks of Plaintiff's surgeries were material facts.

546.    The use of BMP-2 increases a person's chance of cancer by 3.5%

547.    Due to the unnecessary surgeries Dr. Durrani performed, Plaintiff has a 3.5% increased chance of cancer because of the use of BMP-2.

79

548. As a direct and proximate result of the use and implementation of Infuse/BMP-2 Plaintiff has incurred a 3.5% increase in the risk of Cancer. As a result Plaintiff has an increased fear of Cancer.

549. Because of its superior position and professional role as a medical service provider, Journey Lite had a duty to disclose these material facts to Plaintiff and a duty to refrain from misrepresenting such material facts to Plaintiff.

550. Journey Lite intentionally concealed and/or misrepresented said material facts with the intent to defraud Plaintiff in order to induce Plaintiff to undergo the surgery, and thereby profited from the surgeries and procedures Dr. Durrani performed on Plaintiff at Journey Lite.

551. Plaintiff was unaware that Infuse/BMP-2 and Puregen would be used in Plaintiff's surgeries and therefore, was unaware of the health risks of Infuse/BMP-2 and Puregen's use in Plaintiff's spine.

552. Had Plaintiff known before Plaintiff's surgeries that Infuse/BMP-2 and Puregen would be used in Plaintiff's spine and informed of the specific, harmful risks flowing therefrom, Plaintiff would not have undergone the surgeries with Dr. Durrani at Journey Lite.

553. As a direct and proximate result of the fraud upon Plaintiff by Journey Lite, Plaintiff sustained all damages requested in the prayer for relief.

## COUNT IV: OHIO CONSUMER SALES PROTECTION ACT

554. Although the Ohio Consumer Sales Protection statutes O.R.C 1345.01 et seq. exempts physicians, a transaction between a hospital and a patient/consumer is not clearly exempted.

555. Journey Lite's services rendered to Plaintiff constitute a "consumer transaction" as defined in ORC Section 1345.01(A).

556.    Journey Lite omitted suppressed and concealed from Plaintiffs facts with the intent that Plaintiffs rely on these omissions, suppressions and concealments as set forth herein.

557.    Journey Lite's misrepresentations, and its omissions, suppressions and concealments of fact, as described above, constituted unfair, deceptive and unconscionable acts and practices in violation of O.R.C 1345.02 and 1345.03 and to Substantive Rules and case law.

558.    Journey Lite was fully aware of its actions.

559.    Journey Lite was fully aware that Plaintiffs were induced by and relied upon Journey Lite's representations at the time Journey Lite was engaged by Plaintiffs.

560.    Had Plaintiffs been aware that Journey Lite's representations as set forth above were untrue, Plaintiffs would not have used the services of Defendants.

561.    Journey Lite, through its agency and employees knowingly committed the unfair, deceptive and/or unconscionable acts and practices described above.

562.    Journey Lite's actions were not the result of any bona fide errors.

563.    As a result of Journey Lite's unfair, deceptive and unconscionable acts and practices, Plaintiffs have suffered and continues to suffer damages, which include, but are not limited to the following:

      g.   Loss of money paid

      h.   Severe aggravation and inconveniences

      i.   Under O.R.C. 1345.01 Plaintiff is entitled to:

            i.   An order requiring Journey Lite restore to Plaintiffs all money received from Plaintiffs plus three times actual damages and/or actual/statutory damages for each violation;

            ii.   All incidental and consequential damages incurred by Plaintiffs;

            iii.   All reasonable attorneys' fees, witness fees, court costs and other fees incurred;

81

iv.  Such other and further relief that this Court deems just and appropriate.

## COUNT V: PRODUCTS LIABILITY

564.  At all times Infuse/BMP-2 and Puregen are and were products as defined in R.C. §
2307.71(A)(12) and applicable law.

565.  Journey Lite (aka supplier) supplied either Medtronic's (aka manufacturer) Infuse/BMP-2
for surgery performed by Dr. Durrani on Plaintiff.

566.  Journey Lite, as a supplier, failed to maintain Infuse/BMP-2 properly.

567.  Journey Lite did not adequately supply all components required to use either
Infuse/BMP-2 properly.

568.  Journey Lite knew or should have known the FDA requirements and Medtronic's
requirements for using either Infuse/BMP-2.

569.  Journey Lite stored either Infuse/BMP-2 at its facility.

570.  Journey Lite ordered either Infuse/BMP-2 for surgery performed by Durrani.

571.  Journey Lite did not adequately warn Plaintiff that Infuse/BMP-2 would be used without
all FDA and manufacturer required components.

572.  Journey Lite did not gain informed consent from Plaintiff for the use of Infuse/BMP-2, let
alone warn of the supplying of the product without FDA and manufacturer requirements.

573.  Journey Lite failed to supply either Infuse/BMP-2 (aka product) in the manner in which it
was represented.

574.  Journey Lite failed to provide any warning or instruction in regard to Infuse/BMP-2, and
failed to make sure any other party gave such warning or instruction.

575.  Plaintiffs suffered physical, financial, and emotional harm due to Journey Lite's violation
of the Ohio Products Liability act. Plaintiff's injuries were a foreseeable risk

576.    Plaintiff did not alter, modify or change the product, nor did Plaintiff know that the product was being implanted without all required components.

577.    Journey Lite knew or should have known that the product was extremely dangerous and should have exercised care to provide a warning that the product was being used and that the product was being used outside FDA and manufacturer requirements. The harm caused to Plaintiff by not providing an adequate warning was foreseeable.

578.    Journey Lite knew that the product did not conform to the representation of the intended use by the manufacturer yet permitted the product to be implanted into Plaintiff.

579.    Journey Lite, as a supplier, acted in an unconscionable manner in failing to supply the product without all FDA and manufacturer required components.

580.    Journey Lite, as a supplier, acted in an unconscionable manner in failing to warn Plaintiffs that the product was being supplied without all FDA and manufacturer required components.

581.    Journey Lite 's actions demonstrate they took advantage of the Plaintiffs inability, due to ignorance of the product, to understand the product being implanted without FDA and manufacturer required components.

582.    Journey Lite substantially benefited financially by the use of the product as the product allowed for Defendant to charge more for the surgery.

583.    Plaintiffs suffered economic loss as defined in R.C. § 2303.71(A)(2) and applicable law,

584.    Plaintiffs suffered mental and physical harm due to Journey Lite's acts and omissions.

585.    Plaintiffs suffered emotional distress due to acts and omissions of Journey Lite and are entitled to recovery as defined in R.C, § 2307.71(A)(7) and applicable law.

586.    Journey Lite violated the Ohio Products Liability Act R.C. § 2307.71-2307.80

83

587.    Journey Lite violated R.C. § 2307.71(A)(6).

588.    Journey Lite violated The Ohio Consumer Sales Practices Act R.C. § 1345.02-.03.

589.    Journey Lite provided inadequate warnings are defined in R.C, § 2307.76(A) and applicable law.

## COUNT VI: SPOLIATION OF EVIDENCE

590.    Journey Lite through its agents and employees, willfully altered, destroyed, delayed, hid, modified and/or spoiled ("spoiled") Plaintiff's records, billing records, emails, paperwork and related evidence.

591.    Journey Lite has failed to provide itemized billing for Plaintiff in this and other similarly situated Plaintiffs as required by Ohio Admin. Code 3701-83-07(A)(5).

592.    Journey Lite through its agents and employees, spoiled evidence with knowledge that there was pending or probable litigation involving Plaintiff.

593.    Journey Lite's conduct was designed to disrupt Plaintiff's potential and/or actual case, and did in fact and proximately cause disruption, damages and harm to Plaintiff.

## COUNT VII: LOSS OF CONSORTIUM

594.    At all times relevant, the Plaintiffs were married.

595.    As a result of the wrongful acts and omissions of Journey Lite, Plaintiffs were caused to suffer, and will continue to suffer in the future, loss of consortium, loss of society, loss of affection, loss of assistance, and loss of conjugal fellowship, all to the detriment of Plaintiffs' marital relationship.

596.    All the aforesaid injuries and damages were caused proximately by the acts and omissions of Journey Lite.

84

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request and seek justice in the form and procedure of a jury,

verdict and judgment against Defendants on all claims for the following damages:

1.      Past medical bills;

2.      Future medical bills;

3.      Lost income and benefits;

4.      Lost future income and benefits;

5.      Loss of ability to earn income;

6.      Past pain and suffering;

7.      Future pain and suffering;

8.      All damages permitted under Ohio Products Liability Act R.C § 2307.71-2307.80 and all

other applicable law;

9.      Plaintiffs seek a finding that her injuries are catastrophic under Ohio Rev. Code

§2315.18;

10.     All incidental costs and expenses incurred as a result of her injuries;

11.     The damages to their credit as a result of her injuries;

12.     Loss of consortium:

13.     Punitive damages;

14.     Costs;

15.     Attorneys' fees;

16.     Interest;

17.     All property loss;

18.     All other relief to which Plaintiffs are entitled including O.R.C. 1345.01

Based upon 1-17 itemization of damages, the damages sought exceed the minimum jurisdictional amount of this Court and Plaintiffs seek in excess of $25,000.

Respectfully Submitted,

Matthew Hammer (0092483)
Lindsay Boese (0091307)
*Attorneys for Plaintiff*
5247 Madison Pike
Independence, KY 41051
Phone: 513-729-1999
Fax: 513-381-4084
mhammer@ericdeters.com

## JURY DEMAND

Plaintiffs make a demand for a jury under all claims.

Matthew Hammer (0092483)
Lindsay Boese (0091307)

**MELISSA BRAUCHER**
**AFFIDAVIT OF MERIT**
**JOURNEY LITE OF CINCINNATI, LLC**

I, Keith D. Wilkey, M.D., after being duly sworn and cautioned states as follows:

1. I devote at least one-half of my professional time to the active clinical practice in my field of licensure, or its instruction in an accredited school. I am an orthopedic surgeon whose focus is on spine surgery and treatment of those with spine issues.

2. I will supplement this affidavit with another, by a letter or by testimony, based upon any information provided to me after I execute it.

3. My curriculum vitae has been previously provided to opposing counsel in these Dr. Durrani cases and can be provided again upon request. For my review, I rely upon my education, training and experience.

4. I have not counted but I have reviewed, over 50 or more cases involving Dr. Durrani and the hospitals where he once had privileges.

5. I base my opinions in part on my review of all the cases I have reviewed which have revealed similar conduct by Dr. Durrani and the hospitals where he had privileges.

6. I am familiar with applicable standard of care for Ohio, Kentucky and the country for an orthopedic/spine surgeon such as Dr. Durrani.

7. I am also familiar with applicable standard of care, policies, rules and regulations, medical executive committee bylaws, JCAHO requirements, credentialing, supervising, retention of medical staff, granting and rejecting privileges and the peer review process for Journey Lite (hereafter JL).

8. I have reviewed all relevant medical records including radiology of Dr. Durrani's medical treatment of Melissa Braucher and the medical treatment of Melissa Braucher at JL.

9. The Center for Advanced Spine Technologies, Inc. was Dr. Durrani's practice group and he was the sole owner, director and officer of CAST as well as an employee. CAST as such is also responsible for Dr. Durrani's negligence and for their failure to also supervise, discipline and retain Dr. Durrani.

10. I have also reviewed the nursing summary prepared by legal counsel's office for Melissa Braucher. Based upon the number of cases I've reviewed pertaining to Dr. Durrani, legal counsel's office knows what materials I need to review and provides me those materials. In addition, while this affidavit contains case specific

1

information; it also contains information relevant to this case and/or many and/or most and/or all the other cases.  It is prepared for me by counsel with my direction and approval like all of these have been.

11. Based upon my review, the following are the facts I rely upon:

A. MEDICAL HISTORY: hypotension, neck pain since MVA 09/17/2013, endometriosis

    Formatted: Font: Not Bold

B. SURGICAL HISTORY: scoliosis surgery (01/12/1984, Harrington rod & screws, L2?, Shriners Hospital, Lexington, KY)

C. SUMMARY OF CASE:  Pain Management: Dr. Kahn referred her to Dr. Durrani. She chose from a list that Dr. Kahn provided. She was able to get an appointment with Durrani sooner than others.
   09/2009: second office visit: Dr. Durrani told her that her vertebrae were rubbing together and surgery would help relieve pain. Told her that the surgery would help her for at least ten years.

D. 09/10/2009: INITIAL Durrani Office Visit (CAST) Note stated: "She had scoliosis surgery done in 1984 using the Harrington rod compression destruction (sic) rods and has done well until two years ago. The pain has gotten worse and it has started to significantly bother activities of daily living. She points toward the lower back as the site of pain, which radiates down the anterior part and the lateral part predominantly on the left side. She rates her pain as 8/10. She is petrified of injections and is very apprehensive of getting any kind of epidurals.

   NOTE: Melissa Braucher states that at her first visit, with x-ray and MRI in hand, Dr. Durrani recommended injections, but said she couldn't have them due to previously implanted Harrington rod. "He told me the rod was ancient and renaissance". She denied saying that she was petrified of injections.

E. She has degenerative scoliosis in lumbar spine with L2-L3 disk translated in the frontal plane. She has L5-S1 degenerative listhesis. She has significant arthropathy L5-S1 causing foraminal stenosis at L5-S1, causing both right and left nerve root compression. The MRI confirms those findings".

F. "PLAN: She has pain that can very easily be coming from the L2-L3 disk or the L5-S1 facet. My recommendation is for you to kindly do an L5-S1 facet block to exactly identify the source of her pain."

G. 12/04/2009: Lumbar surgery (WCH): L5-S1 facet instrumentation, L5-S1 facet fusion using auto and allograft

2

H. 12/18/2009: Office Visit (CAST) Dr. Durrani stated: "Two weeks postop. Had an L5-S1 bilateral facet screw done. Prior to that she had back and left hip pain for two years. The pain radiated around to the groin and was really quite debilitation. She is having just mainly stiffness in her low back. Her leg pain is a dull ache, at worst 6/10. She is currently not even taking Percocet, only Robaxin, Colace and a Medrol Dosepak. She has not been able to sleep a lot since surgery because she cannot get comfortable" Why is he not providing her some kind of pain relief so soon after surgery? She will start aqua therapy then land therapy. She will get lumbar x-rays before her three month visit". She never had a three month visit

I. Within five months, returned to pain specialist, Dr. Kahn. 07/2012: Dr. Durrani told her that the MRI showed that previous surgery did not work, that he would need to do another surgery to "shave off" a disc.

J. 07/2012: had "block" at CAST: went in w/ pain at 10/10 low back, radiates to left hip (constant), by the time she got to car pain was 15/10.

K. 08/02/2012: Durrani Office Visit (CAST) Note stated: "She, as you recall, had a spinal fusion done many, many tears ago through the old Harrington Compression Distraction System. In 2009, underwent a facet fusion at L5-S1, did well and is now complaining of pain in both SI joints. The pain is in the buttocks, goes into the trochanteric area, sometimes goes to the knees. She has been suffering for a year or so, has been doing therapy, TENS unit, not getting any better. X-rays of the lumbar spine were reviewed, which show bilateral SI joint arthrosis and the previous L5-S1 facet fusion which is good and persistent lumbar curve. IMPRESSION:
   1. L4-L5 lumbar spinal stenosis
   2. L2-L3, L3-L3 lumbar degenerative disk disease with stenosis
   3. Lumbar scoliosis
   4. Prior L5-S1 facet fusion
   5. Bilateral SI joint arthrosis.

L. PLAN: "I have convinced her to get at least two diagnostic blocks, one on the right and one on the left SI joint in order to at least give her some clue of where the pain is coming from."

M. 08/30/2012: Durrani Office Visit (CAST) Note stated: Had SI joint injection on the left with absolutely no relief from it. She said it actually made it worse and she clearly told me she is not doing it again. The second cause of pain was the L5-S1 foraminal stenosis on left which is predominantly where I think the pain is coming from.

N. My clinical impression is lumbar spinal stenosis at L5-S1 lumbar foraminal stenosis L5-S1 prior fusion for scoliosis, prior L5-S1 facet fusion a few years ago,

3

lumbar degenerative spondylolisthesis at L5-S1 left side. Failure of diagnostic and therapeutic injections of the sacroiliac joint".

O. "I told her options are to live with it, to do physical therapy and medication which she has already done, third is to try more injections which she absolutely categorically said no. The fourth option is to do a lumbar hemilaminectomy and foraminotomy on the left side at L5-S1. I told her I think she has more than one source of pain and may require other surgery in the future. She understands that. I told her my goal is to keep her as fusion free for as long as I can. She understands that. We are going to schedule her."

P. 11/29/2012: Durrani Office Visit (CAST) Note stated: "Preoperative visit. Pain in L4 and L5 distribution on left. L4 pain is new at this point. MRI reviewed again and does show stenosis on left foramina at L4-L5 and L5-S1 on left side".

Q. "Given the fact that the L4 is acting up, my recommendation will be to do a lumbar hemilaminectomy, foraminotomy, and decompression at L4-L5 and L5-S1 on the left side". He told Melissa that the first surgery was supposed to last 10 years- lasted 3 years- never improved.

R. Pain much worse than even before surgery.

S. 2nd surgery was to "trim the extra marshmallow" (described as a marshmallow squeezed between 2 graham crackers).

T. 12/15/2012: Surgery (Journey Lite): removed bone spurs, but he had not told her that this was what he would do. He did not talk to her or her husband or father-in-law about how surgery went. They waited in the waiting room and happened to see Dr. Durrani in street clothes leaving the facility. He told them he had found bone spurs, which he removed.

U. 12/15/2012: Durrani Office Visit (CAST) Note stated: "two weeks postop. Wound looks great. Recommend physical therapy. May return to work in two weeks, sooner if she is "bored".

V. Misinterpretation of the pre-operative diagnostic:

07/17/2009 Lumbar MRI (Mercy): Radiologist impression:
  • Mild scoliosis. Vertebral height and alignment are unremarkable. No significant loss of disc space height. Minimal disc desiccation at L5-S1.
09/03/2009 Lumbar spine films (Mercy): Radiologist impression:

4

- Mild levoscoliosis (i.e.: "curvature of spine to left side of body") of lumbar spine
- Harrington rods. One on left extends down to L2 level; one on right to L1 level.
- Prominent left sided spurring at L2-L3.
- Mild anterior spurring at L4
- vertebral body heights and joint spaces are normal.
- No evidence of fracture of either rod.

09/03/2009 Thoracic spine films (Mercy): Radiologist impression:

- Moderate dextroscoliosis (i.e.: "curvature of spine to right side of body") of mid and lower thoracic spine with Harrington rods in place.
- Vertebral body heights and joint spaces appear normal.

07/20/2012 Lumbar spine MRI (Mercy): Radiologist impression:

- Scoliosis of lumbar spine measuring 18°.
- L3-L4: Mild facet DJD. No spinal or neuroforaminal stenosis.
- L4-L5: Moderate facet DJD, worse on left. No significant spinal or neuroforaminal stenosis.

W. Dr. Durrani recommend surgery on the second office visit.

X. Dr. Durrani performed two surgeries on this client:
   12/04/09 SURGERY (WCH): PROCEDURES:
   - L5-S1 facet instrumentation
   - L5-S1 facet fusion using auto and allograft
   PRE AND POSTOPERATIVE DIAGNOSES:
   - L5- S1 facet arthropathy

   12/15/2012: Surgery (Journey Lite): PROCEDURES PERFORMED:
   - Lumbar hemilaminectomy, L4-L5
   - Lumbar foraminotomy, L4-L5
   - Lumbar lateral recess decompression using Baxano at L4 on the left side
   PREOPERATIVE AND POSTOPERATIVE DIAGNOSES:
   - Lumbar spinal stenosis, L4-L5
   - Lumbar foraminal stenosis, L4-L5
   - Lumbar radiculopathy, L4 on left side

Y. BMP-2 was used in the following surgeries:
   12/04/09 SURGERY (WCH): (L5-S1??) auto and allograft" per op report, unable to verify (per CAST bill- only charges on EOB), Billing states: "OR Implant misc." for $16,740.00
   12/15/2012: Surgery (Journey Lite): no BMP-2

5

Z.  he following hardware was implanted:

   12/04/09 SURGERY (WCH): (L5-S1??) PLS system 2 implant (Interventional
Spine)
   12/15/2012: Surgery (Journey Lite): Baxano

AA.      "Off-label" use:
         12/04/09 SURGERY (WCH): (L5-S1??) "Allograft spn srg morslzd" (per
         CAST bill)
         12/15/2012: Surgery (Journey Lite): Baxano

BB.      The operative reports were dictated:
         12/04/09 SURGERY (WCH): dictated 10/31/2010, 11 months
         postoperatively.
                 NOTE: Dictation may have been altered. There are multiple blanks in
                 header of report. (E.g. Primary, Referring, Admit date, Surgery date,
                 Discharge date)

                 12/15/2012: Surgery (Journey Lite): dictation date questionable.
                 NOTE: One copy has no date, another has a handwritten date of
                 12/15/2012, 1440. However, another copy of the same report was faxed
                 from Journey Lite on 01/04/2013, without the handwritten date and time.

CC.      The following consisted of failed hardware:

         12/04/09 SURGERY (WCH): (L5-S1??) "screws & wire" "allograft" (per CAST
         bill)
         12/15/2012: Surgery (Journey Lite):

DD.      Client has seen her PCP: Brenda Manfredi only. Dr. Manfredi has told Ms.
         Braucher that she felt bad that Mellissa has gone through and continues to go
         through so much pain under the care of Dr. Durrani.

EE. Now that the client is finished being treated by Dr. Durrani, the client:
    • In constant pain, which limits ability to perform daily activities, intimacy,
      driving
    • Constant pain across low back, usually in left, sometimes to right hip

FF. Since being treated by Dr. Durrani, the client:
    • Feels constantly stressed due to pain
    • Vacations require multiple stops to move about in attempt to relieve pain
    • *Decreased appetite*
    • Unable to perform household chores: cleaning, laundry, wifely duties

6

- · Can't work due to pain

12. Based upon my review, the following are my **opinions** based upon a reasonable degree of medical certainty pertaining to the deviation in standard of care or negligence, informed consent, battery and fraud claims against Dr. Durrani and JL which proximately caused harm to Plaintiff:

A. Unnecessary surgery(s). Number of surgeries Two, Number unnecessary_____

B. Need to have additional surgery to repair problems created by Dr. Durrani

C. Implantation of BMP-2 without informed consent

D. Failed hardware

E. Failure to obtain proper informed consent for surgery

F. Failure to provide adequate and thorough pre-operative and post-operative patient surgical education

G. Failure to properly post-op monitor the patient

H. Failure to properly perform follow up, post-op care

I. Negligent surgical techniques

J. Failure to maintain accurate and complete surgical records and surgical consent forms

K. Failure to disclose important health information to patient

L. Failure to maintain and complete discharge summary

M. Failure to supervise Dr. Durrani

N. Negligent pre-surgical diagnosis

O. Failure to prepare a timely operative report or other medical record

P. Billing for services not completed

Q. Not informing the patient another surgeon will be doing all or part of the surgery

7

R. Practicing outside Dr. Durrani's scope of training, education, experience, and Board certifications

S. Deviation in standard of care

T. Failure to perform thorough and accurate pre-op nonsurgical evaluation

U. Failure by Dr. Durrani to inform patient of additional/changed procedure and reason

V. Failure by CAST to disclose additional/changed procedure and reason to patient

W. Failure by Dr. Durrani at CAST to properly educate patient regarding diagnosis

X. Prior knowledge of possible complication and not acting properly upon same

Y. Failure to disclose pertinent health information to another health care provider

Z. Fraudulent, negligent and reckless pre-operative work up

AA. Fraudulent, negligent and reckless surgery

BB. Inaccurate, fraudulent, and/or exaggeration of diagnoses

CC. Failure to properly educate patient regarding diagnoses

DD. Failure to attempt non-surgical conservative treatment

EE. Failure to perform thorough and accurate pre-op nonsurgical evaluation

FF. Failure by Dr. Durrani at JL to perform accurate and complete preoperative teaching

GG. Failure by Dr. Durrani at JL to properly educate patient regarding diagnoses

HH. Failure by Dr. Durrani at JL to maintain accurate and/or complete medical records

II. Failure of informed consent by Dr. Durrani at JL

JJ. Failure of JL to insure Dr. Durrani and CAST had obtained proper informed consent

8

KK.    Failure of JL to obtain proper acknowledgement of consent

LL.    Failure by Dr. Durrani at JL to disclose pertinent health information

MM.    Failure by JL to disclose additional/changed procedure and reason to patient

NN.    Failure by JL to supervise staff

OO.    Failure by JL staff to properly document abnormalities and follow up care

PP.    Non-approved hardware combinations

QQ.    Dr. Durrani made false and material misrepresentations of material facts intended to mislead Melissa Braucher and concealed material facts he had a duty to disclose. JL and CAST concealed material facts they had a duty to disclose. Melissa Braucher was justified in relying on the misrepresentation and did rely proximately causing harm to Melissa Braucher. Dr. Durrani and JL intentionally misled Melissa Braucher. Melissa Braucher had the right to correct information.

13.    Based upon my review of the deposition testimony, the JCAHO requirements, the MEC bylaws and all the information provided to me, I am able to adopt the following opinions relating to JL pertaining to the claims against them. JL's actions and inactions detailed in this affidavit proximately caused harm to Plaintiff. JL are both being referenced when only JL is named. I hold the following opinions relative to JL pertaining to their conduct acting through their administration and MEC. The time period covered is from the time Dr. Durrani joined JL until he left by August 2013.   In addition to my opinions, I set forth facts I rely upon. This includes all which I referenced that I reviewed. In addition to all of the above, I attest to the following:

1.    JL's motive for their actions and inactions towards Dr. Durrani was financial gain.

2.    The MEC, administration and Boards of JL failed to "govern the affairs of the Medical Staff."

3.    The MEC, administration and Boards of JL failed to enforce their rules upon Dr. Durrani as they were required to do.

4.    The MEC, administration and Boards of JL failed to provide oversight of Dr. Durrani as they were required to do.

5.    The MEC, administration and Boards of JL failed to properly evaluate Dr. Durrani.

9

6. The Orthopedic and Surgery Departments abdicated their responsibility under the MEC bylaws to review, investigate and supervise Dr. Durrani.

7. The MEC, administration and Boards of JL failed to properly discipline Dr. Durrani including summary suspensions and revocation.

8. The MEC, administration and Boards of JL failed to properly discipline under the MEC bylaws as it pertains to Dr. Durrani.

9. The MEC, administration and Boards of JL ignored the information readily available pertaining to Dr. Durrani before credentialing and granting him privileges.

10. The MEC, administration and Boards of JL failed to act on Dr. Durrani's disruptive behavior, unprofessional behavior and clinical performance placing Plaintiff at risk.

11. The MEC, administration and Boards of JL certified and approved the unnecessary procedures of Dr. Durrani on Plaintiff knowing they were unnecessary and knowingly allowing the improper use of BMP-2 and/or PureGen and knowing there was not proper informed consent.

12. The MEC, administration and Boards of JL failed to act on Dr. Durrani's failure in medical record documentation.

13. The MEC, administration and Boards of JL failed to require Dr. Durrani to follow the rules for off label experimental procedures.

14. The MEC, administration and Boards of JL allowed Dr. Durrani to use undisclosed and unqualified surgeons to perform his surgeries including fellows and interns.

15. The MEC, administration and Boards of JL allowed Dr. Durrani to do multiple surgeries at once.

16. JL have refused to provide as privileged the peer review information from JL for Dr. Durrani to either me or their own expert. Therefore, we have no knowledge of what action, if any, was taken against him. However, based upon the facts here, it is obvious they failed to take action.

17. Based upon all of the above, it's my opinion that JL were negligent in their credentialing, supervising, disciplining and retaining Dr. Durrani on staff and allowing him to obtain and keep privileges at JL under the standards of Ohio and this proximately caused harm to Plaintiff.

10

18. The facts support Melissa Braucher's claim for negligence, battery, lack of consent and fraud.

19. As a result of the negligence and conduct of Dr. Durrani and JL Melissa Braucher suffered damages proximately caused by them, including the following:

    A. Permanent disability
    B. Physical deformity and scars
    C. Past, Current and Future Physical and Mental Pain and Suffering
    D. Lost income past, present and future
    E. Loss of enjoyment of life
    F. Past medical expenses
    G. Future medical expenses approximately in the amount of $50,000 to $250,000 depending on course of treatment
    H. Aggravation of a pre-existing condition
    I. Decreased ability to earn income
    J. 3% increased risk of cancer and fear of cancer if BMP-2 was used.

AFFIANT SAYETH FURTHER NOT

_____
KEITH D. WILKEY, M.D.


## NOTARY

SUBSCRIBED, SWORN TO AND ACKNOWLEDGED before me, a Notary Public, by Keith D. Wilkey, M.D. on this _13th_ day of ~~June~~ August, 2014.

_____
NOTARY PUBLIC
My Commission Exp.: _12-5-15_

_Kenton_ County

State of _Kentucky_

11

**MELISSA BRAUCHER**
**AFFIDAVIT OF MERIT**
**WEST CHESTER**

I, Keith D. Wilkey, M.D., after being duly sworn and cautioned states as follows:

1. I devote at least one-half of my professional time to the active clinical practice in my field of licensure, or its instruction in an accredited school. I am an orthopedic surgeon whose focus is on spine surgery and treatment of those with spine issues.

2. I will supplement this affidavit with another, by a letter or by testimony, based upon any information provided to me after I execute it.

3. My curriculum vitae has been previously provided to opposing counsel in these Dr. Durrani cases and can be provided again upon request. For my review, I rely upon my education, training and experience.

4. I have not counted but I have reviewed, over 50 or more cases involving Dr. Durrani and the hospitals where he once had privileges.

5. I base my opinions in part on my review of all the cases I have reviewed which have revealed similar conduct by Dr. Durrani and the hospitals where he had privileges.

6. I am familiar with applicable standard of care for Ohio, Kentucky and the country for an orthopedic/spine surgeon such as Dr. Durrani.

7. I am also familiar with applicable standard of care, policies, rules and regulations, medical executive committee bylaws, JCAHO requirements, credentialing, supervising, retention of medical staff, granting and rejecting privileges and the peer review process for West Chester Hospital, LLC, also referred to as West Chester Hospital or West Chester Medical Center and UC Health.

8. I have reviewed all relevant medical records including radiology of Dr. Durrani's medical treatment of Melissa Braucher and the medical treatment of Melissa Braucher at West Chester.

9. I have reviewed the Response to Summary Judgment in the Brenda Shell case and all the exhibits attached to it.

10. The Center for Advanced Spine Technologies, Inc. was Dr. Durrani's practice group and he was the sole owner, director and officer of CAST as well as an employee. CAST as such is also responsible for Dr. Durrani's negligence and for their failure to also supervise, discipline and retain Dr. Durrani.

11. I have also reviewed the nursing summary prepared by legal counsel's office for Melissa Braucher. Based upon the number of cases I've reviewed pertaining to Dr.

1

Durrani, legal counsel's office knows what materials I need to review and provides me those materials. In addition, while this affidavit contains case specific information; it also contains information relevant to this case and/or many and/or most and/or all the other cases. It is prepared for me by counsel with my direction and approval like all of these have been.

12. Based upon my review, the following are the facts I rely upon:

A. MEDICAL HISTORY: hypotension, neck pain since MVA 09/17/2013, ⸱⸱⸱⸱⸱⸱⸱⸱⸱⸱⸱⸱⸱⸱⸱⸱⸱⸱⸱⸱⸱     `Formatted: Font: Not Bold`
   endometriosis

B. SURGICAL HISTORY: scoliosis surgery (01/12/1984, Harrington rod & screws, L2?, Shriners Hospital, Lexington, KY)

C. SUMMARY OF CASE: Pain Management: Dr. Kahn referred her to Dr. Durrani. She chose from a list that Dr. Kahn provided. She was able to get an appointment with Durrani sooner than others.
   09/2009: second office visit: Dr. Durrani told her that her vertebrae were rubbing together and surgery would help relieve pain. Told her that the surgery would help her for at least ten years.

D. 09/10/2009: INITIAL Durrani Office Visit (CAST) Note stated: "She had scoliosis surgery done in 1984 using the Harrington rod compression destruction (sic) rods and has done well until two years ago. The pain has gotten worse and it has started to significantly bother activities of daily living. She points toward the lower back as the site of pain, which radiates down the anterior part and the lateral part predominantly on the left side. She rates her pain as 8/10. She is petrified of injections and is very apprehensive of getting any kind of epidurals.

   NOTE: Melissa Braucher states that at her first visit, with x-ray and MRI in hand, Dr. Durrani recommended injections, but said she couldn't have them due to previously implanted Harrington rod. "He told me the rod was ancient and renaissance". She denied saying that she was petrified of injections.

E. She has degenerative scoliosis in lumbar spine with L2-L3 disk translated in the frontal plane. She has L5-S1 degenerative listhesis. She has significant arthropathy L5-S1 causing foraminal stenosis at L5-S1, causing both right and left nerve root compression. The MRI confirms those findings".

F. "PLAN: She has pain that can very easily be coming from the L2-L3 disk or the L5-S1 facet. My recommendation is for you to kindly do an L5-S1 facet block to exactly identify the source of her pain."

2

G. 12/04/2009: Lumbar surgery (WCH): L5-S1 facet instrumentation, L5-S1 facet fusion using auto and allograft

H. 12/18/2009: Office Visit (CAST) Dr. Durrani stated: "Two weeks postop. Had an L5-S1 bilateral facet screw done. Prior to that she had back and left hip pain for two years. The pain radiated around to the groin and was really quite debilitation. She is having just mainly stiffness in her low back. Her leg pain is a dull ache, at worst 6/10. She is currently not even taking Percocet, only Robaxin, Colace and a Medrol Dosepak. She has not been able to sleep a lot since surgery because she cannot get comfortable" Why is he not providing her some kind of pain relief so soon after surgery? She will start aqua therapy then land therapy. She will get lumbar x-rays before her three month visit". She never had a three month visit

I. Within five months, returned to pain specialist, Dr. Kahn. 07/2012: Dr. Durrani told her that the MRI showed that previous surgery did not work, that he would need to do another surgery to "shave off" a disc.

J. 07/2012: had "block" at CAST: went in w/ pain at 10/10 low back, radiates to left hip (constant), by the time she got to car pain was 15/10.

K. 08/02/2012: Durrani Office Visit (CAST) Note stated: "She, as you recall, had a spinal fusion done many, many tears ago through the old Harrington Compression Distraction System. In 2009, underwent a facet fusion at L5-S1, did well and is now complaining of pain in both SI joints. The pain is in the buttocks, goes into the trochanteric area, sometimes goes to the knees. She has been suffering for a year or so, has been doing therapy, TENS unit, not getting any better. X-rays of the lumbar spine were reviewed, which show bilateral SI joint arthrosis and the previous L5-S1 facet fusion which is good and persistent lumbar curve.
IMPRESSION:
1. L4-L5 lumbar spinal stenosis
2. L2-L3, L3-L3 lumbar degenerative disk disease with stenosis
3. Lumbar scoliosis
4. Prior L5-S1 facet fusion
5. Bilateral SI joint arthrosis.

L. PLAN: "I have convinced her to get at least two diagnostic blocks, one on the right and one on the left SI joint in order to at least give her some clue of where the pain is coming from."

M. 08/30/2012: Durrani Office Visit (CAST) Note stated: Had SI joint injection on the left with absolutely no relief from it. She said it actually made it worse and she clearly told me she is not doing it again. The second cause of pain was the L5-S1 foraminal stenosis on left which is predominantly where I think the pain is coming from.

3

N. My clinical impression is lumbar spinal stenosis at L5-S1 lumbar foraminal stenosis L5-S1 prior fusion for scoliosis, prior L5-S1 facet fusion a few years ago, lumbar degenerative spondylolisthesis at L5-S1 left side. Failure of diagnostic and therapeutic injections of the sacroiliac joint".

O. "I told her options are to live with it, to do physical therapy and medication which she has already done, third is to try more injections which she absolutely categorically said no. The fourth option is to do a lumbar hemilaminectomy and foraminotomy on the left side at L5-S1. I told her I think she has more than one source of pain and may require other surgery in the future. She understands that. I told her my goal is to keep her as fusion free for as long as I can. She understands that. We are going to schedule her."

P. 11/29/2012: Durrani Office Visit (CAST) Note stated: "Preoperative visit. Pain in L4 and L5 distribution on left. L4 pain is new at this point. MRI reviewed again and does show stenosis on left foramina at L4-L5 and L5-S1 on left side".

Q. "Given the fact that the L4 is acting up, my recommendation will be to do a lumbar hemilaminectomy, foraminotomy, and decompression at L4-L5 and L5-S1 on the left side". He told Melissa that the first surgery was supposed to last 10 years- lasted 3 years- never improved.

R. Pain much worse than even before surgery.

S. 2nd surgery was to "trim the extra marshmallow" (described as a marshmallow squeezed between 2 graham crackers).

T. 12/15/2012: Surgery (Journey Lite): removed bone spurs, but he had not told her that this was what he would do. He did not talk to her or her husband or father-in-law about how surgery went. They waited in the waiting room and happened to see Dr. Durrani in street clothes leaving the facility. He told them he had found bone spurs, which he removed.

U. 12/15/2012: Durrani Office Visit (CAST) Note stated: "two weeks postop. Wound looks great. Recommend physical therapy. May return to work in two weeks, sooner if she is "bored".

V. Misinterpretation of the pre-operative diagnostic:

4

07/17/2009 Lumbar MRI (Mercy): Radiologist impression:
- Mild scoliosis. Vertebral height and alignment are unremarkable. No significant loss of disc space height. Minimal disc desiccation at L5-S1.

09/03/2009 Lumbar spine films (Mercy): Radiologist impression:
- Mild levoscoliosis (i.e.: "curvature of spine to left side of body") of lumbar spine
- Harrington rods. One on left extends down to L2 level; one on right to L1 level.
- Prominent left sided spurring at L2-L3.
- Mild anterior spurring at L4
- vertebral body heights and joint spaces are normal.
- No evidence of fracture of either rod.

09/03/2009 Thoracic spine films (Mercy): Radiologist impression:
- Moderate dextroscoliosis (i.e.: "curvature of spine to right side of body") of mid and lower thoracic spine with Harrington rods in place.
- Vertebral body heights and joint spaces appear normal.

07/20/2012 Lumbar spine MRI (Mercy): Radiologist impression:
- Scoliosis of lumbar spine measuring 18°.
- L3-L4: Mild facet DJD. No spinal or neuroforaminal stenosis.
- L4-L5: Moderate facet DJD, worse on left. No significant spinal or neuroforaminal stenosis.

W. Dr. Durrani recommend surgery on the second office visit.


X. Dr. Durrani performed two surgeries on this client:
12/04/09 SURGERY (WCH): PROCEDURES:
- L5-S1 facet instrumentation
- L5-S1 facet fusion using auto and allograft
PRE AND POSTOPERATIVE DIAGNOSES:
- L5-S1 facet arthropathy


12/15/2012: Surgery (Journey Lite): PROCEDURES PERFORMED:
- Lumbar hemilaminectomy, L4-L5
- Lumbar foraminotomy, L4-L5
- Lumbar lateral recess decompression using Baxano at L4 on the left side
PREOPERATIVE AND POSTOPERATIVE DIAGNOSES:
- Lumbar spinal stenosis, L4-L5
- Lumbar foraminal stenosis, L4-L5
- Lumbar radiculopathy, L4 on left side

5

Y. BMP-2 was used in the following surgeries:
12/04/09 SURGERY (WCH): (L5-S1??) auto and allograft" per op report, unable to verify (per CAST bill- only charges on EOB), Billing states: "OR Implant misc." for $16,740.00
12/15/2012: Surgery (Journey Lite): no BMP-2

Z. he following hardware was implanted:

12/04/09 SURGERY (WCH): (L5-S1??) PLS system 2 implant (Interventional Spine)
12/15/2012: Surgery (Journey Lite): Baxano

AA. "Off-label" use:
12/04/09 SURGERY (WCH): (L5-S1??) "Allograft spn srg morslzd" (per CAST bill)
12/15/2012: Surgery (Journey Lite): Baxano

BB. The operative reports were dictated:
12/04/09 SURGERY (WCH): dictated 10/31/2010, 11 months postoperatively.
NOTE: Dictation may have been altered. There are multiple blanks in header of report. (E.g. Primary, Referring, Admit date, Surgery date, Discharge date)

12/15/2012: Surgery (Journey Lite): dictation date questionable.
NOTE: One copy has no date, another has a handwritten date of 12/15/2012, 1440. However, another copy of the same report was faxed from Journey Lite on 01/04/2013, without the handwritten date and time.

CC. The following consisted of failed hardware:

12/04/09 SURGERY (WCH): (L5-S1??) "screws & wire" "allograft" (per CAST bill)
12/15/2012: Surgery (Journey Lite):

DD. Client has seen her PCP: Brenda Manfredi only. Dr. Manfredi has told Ms. Braucher that she felt bad that Mellissa has gone through and continues to go through so much pain under the care of Dr. Durrani.

EE. Now that the client is finished being treated by Dr. Durrani, the client:
• In constant pain, which limits ability to perform daily activities, intimacy, driving

6

- Constant pain across low back, usually in left, sometimes to right hip

FF. Since being treated by Dr. Durrani, the client:
  - Feels constantly stressed due to pain
  - Vacations require multiple stops to move about in attempt to relieve pain
  - Decreased appetite
  - Unable to perform household chores: cleaning, laundry, wifely duties
  - Can't work due to pain

13. Based upon my review, the following are my **opinions** based upon a reasonable degree of medical certainty pertaining to the deviation in standard of care or negligence, informed consent, battery and fraud claims against Dr. Durrani, CAST, West Chester and UC Health which proximately caused harm to Plaintiff:

   A. Unnecessary surgery(s). Number of surgeries-Two, Number unnecessary _____

   B. Need to have additional surgery to repair problems created by Dr. Durrani

   C. Implantation of Puregen without informed consent

   D. Implantation of BMP-2 without informed consent

   E. Failed hardware

   F. Failure to obtain proper informed consent for surgery

   G. Failure to provide adequate and thorough pre-operative and post-operative patient surgical education

   H. Failure to properly post-op monitor the patient

   I. Failure to properly perform follow up, post-op care

   J. Negligent surgical techniques

   K. Failure to maintain accurate and complete surgical records and surgical consent forms

   L. Failure to disclose important health information to patient

   M. Failure to maintain and complete discharge summary

   N. Failure to supervise Dr. Durrani

   O. Negligent pre-surgical diagnosis

7

P. Failure to prepare a timely operative report or other medical record

Q. Billing for services not completed

R. Not informing the patient another surgeon will be doing all or part of the surgery

S. Practicing outside Dr. Durrani's scope of training, education, experience, and Board certifications

T. Deviation in standard of care.

U. Failure to perform thorough and accurate pre-op nonsurgical evaluation

V. Failure by Dr. Durrani to inform patient of additional/changed procedure and reason

W. Failure by CAST to disclose additional/changed procedure and reason to patient

X. Failure by Dr. Durrani at CAST to properly educate patient regarding diagnosis

Y. Prior knowledge of possible complication and not acting properly upon same

Z. Failure to disclose pertinent health information to another health care provider

AA. Fraudulent, negligent and reckless pre-operative work up

BB. Fraudulent, negligent and reckless surgery

CC. Inaccurate, fraudulent, and/or exaggeration of diagnoses

DD. Failure to properly educate patient regarding diagnoses

EE. Failure to attempt non-surgical conservative treatment

FF. Failure to perform thorough and accurate pre-op nonsurgical evaluation

GG. Failure by Dr. Durrani at UC/West Chester Hospital to perform accurate and complete preoperative teaching

HH. Failure by Dr. Durrani at UC/West Chester Hospital to properly educate patient regarding diagnoses

8

II.    Failure by Dr. Durrani at UC/West Chester Hospital to maintain accurate and/or complete medical records

JJ.    Failure of informed consent by Dr. Durrani at UC/West Chester Hospital

KK.    Failure of UC/West Chester Hospital to insure Dr. Durrani and CAST had obtained proper informed consent

LL.    Failure of UC/West Chester Hospital to obtain proper acknowledgement of consent

MM.    Failure by Dr. Durrani at UC/West Chester Hospital to disclose pertinent health information

NN.    Failure by UC/West Chester Health to disclose additional/changed procedure and reason to patient

OO.    Failure by UC/West Chester Health to supervise staff

PP.    Failure by UC/West Chester Medical staff to properly document abnormalities and follow up care

QQ.    Non-approved hardware combinations

RR.    Dr. Durrani made false and material misrepresentations of material facts intended to mislead Melissa Braucher and concealed material facts he had a duty to disclose. UC/West Chester Health and CAST concealed material facts they had a duty to disclose. Melissa Braucher was justified in relying on the misrepresentation and did rely proximately causing harm to Melissa Braucher. Dr. Durrani, CAST, and UC/West Chester Health intentionally misled Melissa Braucher. Melissa Braucher had the right to correct information.

14. The testimony, facts and exhibits of Brenda Shell's Response to Motion for Summary Judgment and Exhibits to same are applicable to all the claims against West Chester Medical Center (WCMC) and UC Health for all claims, including negligent retention and credentialing brought by Plaintiff.

15.    Based upon my review of the deposition testimony, the JCAHO requirements, the MEC bylaws and all the information provided to me, I am able to adopt the following opinions relating to WCMC and UC Health pertaining to the claims against them. WCMC's and UC Health's actions and inactions detailed in this affidavit proximately caused harm to Plaintiff. WCMC and UC Health are both being referenced when only WCMC is named. I hold the following opinions relative to WCMC and UC Health pertaining to their conduct acting through their administration and MEC. The time period covered is from the time Dr. Durrani

9

sought privileges prior to WCMC opening in May 2009 through May 2013 when he no longer had privileges. In addition to my opinions, I set forth facts I rely upon. This includes all which I referenced that I reviewed. In addition to all of the above, I attest to the following:

## FACTS

1. According to West Chester's first Executive Vice President, Carol King, she did not explore the "rumors" about Dr. Durrani's leaving Children's.

2. According to Carol King, the hospital tracked problem issues yet WCMC have failed to produce the information under peer review protection.

3. According to circulating nurse, Janet Smith, presets were changed in the computer to indicate the procedure Dr. Durrani performed after the procedure.

4. According to Janet Smith, despite no one at West Chester never working with Dr. Durrani before, WCMC never checked him out.

5. According to former University Hospital President (a UC Health hospital), Brian Gibler, hospitals face financial challenges.

6. According to risk manager, David Schwallie, risk management knew Durrani had issues.

7. According to radiologist, Thomas Brown, there were surgeons questioning Durrani's decisions to perform surgery.

8. According to medical staff director, Paula Hawk, a policy called "stop the lying" was implemented the same year and month they kicked out Dr. Durrani. This infers a poor environment of honesty and disclosure before this policy.

9. According to Paula Hawk and as the director of medical staff, money is not supposed to trump patient safety.

10. According to Paula Hawk, she admits peer review is for hospitals to protect each other.

11. According to Paula Hawk, she admits hospitals are interested in volume, something Dr. Durrani provided for WCMC and UC Health.

12. According to Mike Jeffers, the director of finance, they tracked Dr. Durrani's financial numbers.

10

13. According to Mike Jeffers, he admits Dr. Durrani helped them in their time of need.

14. According to Mike Jeffers, Dr. Durrani was the highest money generator.

15. According to Mike Jeffers, he knew Dr. Durrani had more than one surgical suite assigned at once.

16. According to Mike Jeffers, bonuses were paid to him and others based upon finances.

17. According to Dr. Peter Stern, he knew Dr. Durrani was only "satisfactory," not a world class spine surgeon as West Chester advertised.

18. Dr. Stern doesn't deny admitting UC Health looked the other way on Durrani because of money.

19. According to credentialing manager, Ann Shelly, there was plenty of "public knowledge" about Dr. Durrani to check before credentialing.

20. According to Ann Shelly, West Chester relied on the NPDB they knew was protected by hospitals.

21. Dr. Eric Schneeberger, Dr. Durrani's partner, was on the MEC at WCMC.

22. According to Eric Schneeberger, West Chester knew about Durrani scheduling surgeries long into the day and night.

23. According to former nursing manager, Elaine Kunko, WCMC knew about Dr. Durrani not completing records.

24. According to Elaine Kunko, WCMC knew Dr. Durrani would claim surgeries were emergency when they were not.

25. According to Elaine Kunko, WCMC knew there was an issue with Dr. Durrani not being in the room doing surgery on "his" patient.

26. According to Elaine Kunko, even the OR nurses knew WCMC put up with Dr. Durrani for money.

27. According to Elaine Kunko, WCMC tracked Dr. Durrani's financial numbers.

28. According to perioperative director, Lisa Davis, WCMC knew Durrani's office is supposed to get consents so WCMC had an obligation to make sure they did.

11

29. According to Jill Stegman, the risk manager at West Chester, she knew Durrani had "issues."

30. *Jill Stegman confirms Gerry Goodman's complaints.*

31. According to Kathy Hays, WCMC knew how Dr. Durrani used BMP-2 and PureGen.

32. Dr. Tim Kremchek, the Chief of the Orthopedic department, failed to do his job under the MEC bylaws as it related to the supervision and review of Dr. Durrani.

33. According to Dr. Tim Kremchek, he knew Dr. Durrani was "sloppy."

34. Kevin Joseph, the CEO of WCMC, claims to know nothing about surgery operations in his hospital.

35. Kevin Joseph, the CEO, claims a hospital must protect patients from unnecessary harm "as much as they can."

36. Kevin Joseph, the CEO, claims WCMC doesn't have oversight of surgeons doing what Plaintiff claims Durrani was doing. (Despite what his bylaws state.)

37. Kevin Joseph, the CEO, denies the hospital has any responsibility if Dr. Durrani did an unnecessary surgery.

38. Kevin Joseph, the CEO, despite his finance office tracking it, denies any knowledge of BMP-2 use.

39. Kevin Joseph, the CEO, denies knowing about any complaints about Dr. Durrani.

40. Kevin Joseph, the CEO, admits they benefited financially from Dr. Durrani, including his own pay.

41. Mark Tromba, the OR manager, admits BMP-2 use as used by Dr. Durrani.

42. According to Jeff Drapalik, the Senior Leadership team, including Joseph, met weekly and reviewed numbers.

43. According to Jeff Drapalik, the CFO of WCMC knew Dr. Durrani was a high volume money maker.

12

44. Lesley Gilbertson, a member of the MEC of WCMC, and anesthesiologist working with Durrani, had a concern about how long Durrani kept patients under.

45. According to materials manager, Dennis Robb, WCMC knew the volumes of BMP-2 being used.

46. According to Karen Ghaffari, WCMC knew the chart documentation of Dr. Durrani was not in compliance with their bylaws.

47. Patrick Baker, nursing VP at WCMC admits WCMC tracked the financial performance of Dr. Durrani.

48. According to nurse, Vicki Scott, the administration of WCMC knew from the outset of West Chester all the serious issues pertaining to Dr. Durrani.

49. According to Vicki Scott, West Chester's risk manager began to ignore complaints from Ms. Scott.

50. According to Vicki Scott, staff was scared to speak out.

51. According to Vicki Scott, patients didn't know who did the surgeries—Shanti or Durrani.

52. According to Vicki Scott, records were not accurate who was in the OR at what time.

53. According to Vicki Scott, everyone at WCMC knew it was about money.

54. According to Vicki Scott, WCMC knew about Dr. Durrani's and West Chester's illegal use of PureGen.

55. According to Vicki Scott, Dr. Durrani was a behavior problem.

56. According to patient representative, Elizabeth Dean, WCMC tracked Dr. Durrani's volumes from the outset and the CFO loved what he saw.

57. According to Elizabeth Dean, WCMC knew Dr. Durrani had issues at Children's.

58. According to Elizabeth Dean, WCMC knew Dr. Durrani was performing unnecessary procedures by volumes and repeats.

59. According to nurse, Scott Rimer, WCMC knew Dr. Durrani waited until after surgeries to document what procedures were planned.

13

60. According to Scott Rimer, patients at WCMC had procedures they did not consent to and WCMC knew it.

61. According to Scott Rimer, sterile fields were not protected.

62. According to Scott Rimer, WCMC knew PureGen was being used by Dr. Durrani and allowed it.

63. According to Thomas Blank, PureGen was an alternative to BMP-2, which WCMC turned to based upon insurance denials of BMP-2. In addition, Dr. Durrani operated an unethical POD of Alphatech called Evolution Medical to sell PureGen to West Chester.

64. According to Gerry Goodman, WCMC tracked BMP-2 use by Dr. Durrani; patients did not know who at times performed their surgery Dr. Shanti or Dr. Durrani; electronic records had to be changed after Dr. Durrani's surgery; Dr. Durrani and WCMC never obtained informed consents; Dr. Durrani's volume was a warning sign of overutilization. Gerry Goodman reported all these concerns to WCMC and there was no action. Gerry Goodman was told and concluded that WCMC did not want to do anything about Dr. Durrani because of money rewards.

## ADDITIONAL OPINIONS

65. The Center of Advanced Spine Technologies (CAST) negligently supervised and retained Dr. Durrani, including by allowing Dr. Durrani to perform unnecessary procedures and surgeries; use BMP-2 and/or PureGen without appropriate consent; failing to disclose Dr. Shanti and others involvement in surgery; improper billing; changing the pre-op and post-op records to coincide when the surgery was not the surgery disclosed; and all other conduct detailed in the documents I reviewed.

66. WCMC, UC Health and CAST's motive for their actions and inactions towards Dr. Durrani was financial gain.

67. The MEC, administration and Boards of WCMC and UC Health failed to "govern the affairs of the Medical Staff."

68. The MEC, administration and Boards of WCMC and UC Health failed to enforce their rules upon Dr. Durrani as they were required to do.

69. The MEC, administration and Boards of WCMC and UC Health failed to provide oversight of Dr. Durrani as they were required to do.

70. The MEC, administration and Boards of WCMC and UC Health failed to properly evaluate Dr. Durrani.

14

71. *The Orthopedic and Surgery Departments abdicated their responsibility under the MEC bylaws to review, investigate and supervise Dr. Durrani.*

72. The MEC, administration and Boards of WCMC and UC Health failed to properly discipline Dr. Durrani including summary suspensions and revocation.

73. The MEC, administration and Boards of WCMC and UC Health failed to properly discipline under the MEC bylaws as it pertains to Dr. Durrani.

74. The MEC, administration and Boards of WCMC and UC Health ignored the information readily available pertaining to Dr. Durrani before credentialing and *granting him privileges.*

75. The MEC, administration and Boards of WCMC and UC Health failed to act on Dr. Durrani's disruptive behavior, unprofessional behavior and clinical performance placing Plaintiff at risk.

76. The MEC, administration and Boards of WCMC and UC Health certified and approved the unnecessary procedures of Dr. Durrani on Plaintiff knowing they were unnecessary and knowingly allowing the improper use of BMP-2 and/or PureGen and knowing there was not proper informed consent.

77. The MEC, administration and Boards of WCMC and UC Health failed to act on Dr. Durrani's failure in medical record documentation.

78. The MEC, administration and Boards of WCMC and UC Health failed to require Dr. Durrani to follow the rules for off label experimental procedures.

79. The MEC, administration and Boards of WCMC and UC Health allowed Dr. Durrani to use undisclosed and unqualified surgeons to perform his surgeries including Dr. Shanti.

80. The MEC, administration and Boards of WCMC and UC Health allowed Dr. Durrani to do multiple surgeries at once.

81. *WCMC and UC Health have refused to provide as privileged the peer review information from WCMC for Dr. Durrani to either me or their own expert.* Therefore, we have no knowledge of what action, if any, was taken against him. However, based upon the facts here, it is obvious they failed to take action.

82. Based upon all of the above, it's my opinion that WCMC and UC Health were negligent in their credentialing, supervising, disciplining and retaining Dr. Durrani on staff and allowing him to obtain and keep privileges at WCMC

15

under the standards of Ohio as detailed in the Brenda Shell's Response to Motion for Summary Judgment and this proximately caused harm to Plaintiff.

83. The facts support Melissa Braucher's claim for negligence, battery, lack of consent and fraud.

84. As a result of the negligence and conduct of Dr. Durrani, CAST, West Chester and UC Health, Melissa Braucher suffered damages proximately caused by them, including the following:

A. Permanent disability
B. Physical deformity and scars
C. Past, Current and Future Physical and Mental Pain and Suffering
D. Lost income past, present and future
E. Loss of enjoyment of life
F. Past medical expenses
G. Future medical expenses approximately in the amount of $50,000 to $250,000 depending on course of treatment
H. Aggravation of a pre-existing condition
I. Decreased ability to earn income
J. 3% increased risk of cancer and fear of cancer if BMP-2 was used.

AFFIANT SAYETH FURTHER NOT

KEITH D. WILKEY, M.D.

NOTARY

SUBSCRIBED, SWORN TO AND ACKNOWLEDGED before me, a Notary Public, by Keith D. Wilkey, M.D. on this _13th_ day of ~~June~~ August, 2014.

NOTARY PUBLIC
My Commission Exp.: _12-5-15_

_Kenton_ County
State of _Kentucky_

16

```
                        COURT OF COMMON PLEAS
                        HAMILTON COUNTY, OHIO
```

MELISSA BRAUCHER
        **PLAINTIFF**

                                                Use below number on
                                                all future pleadings

        -- vs --

                                        No.  A 1506956
                                                SUMMONS

ABUBAKAR ATIQ DURRANI M D
        **DEFENDANT**

        UC HEALTH
        % GH&R BUSINESS SVCS INC                D - 4
        511 WALNUT STREET
        CINCINNATI OH 45202


You are notified
that you have been named Defendant(s) in a complaint filed by

        MELISSA BRAUCHER
        4100 WOODMONT DRIVE
        BATAVIA OH 45103

                                                        Plaintiff(s)

in the Hamilton County, COMMON PLEAS CIVIL Division,
**TRACY WINKLER, 1000 MAIN STREET   ROOM 315,
CINCINNATI, OH 45202.**
You are hereby summoned and required to serve upon the plaintiff's
attorney, or upon the plaintiff, if he/she has no attorney of record, a
copy of an answer to the complaint within twenty-eight (28) days after
service of this summons on you, exclusive of the day of service. Your
answer must be filed with the Court within three (3) days after the
service of a copy of the answer on the plaintiff's attorney.

Further, pursuant to Local Rule 10 of Hamilton County, you are also required to
file a Notification Form to receive notice of all future hearings.

If you fail to appear and defend, judgement by default will be rendered
against you for the relief demanded in the attached complaint.


Name and Address of attorney          TRACY WINKLER
MATT HAMMER                           Clerk, Court of Common Pleas
5247 MADISON PIKE                       Hamilton County, Ohio
INDEPENDENCE        KY
41051

                                By  RICK HOFMANN
                                                Deputy

                                Date:   December 23, 2015

D112985525

```
                          COURT OF COMMON PLEAS
                          HAMILTON COUNTY, OHIO
```

MELISSA BRAUCHER
    **PLAINTIFF**

                                           Use below number on
                                           all future pleadings

      -- vs --

                                 No.  A 1506956
                                     SUMMONS

ABUBAKAR ATIQ DURRANI M D
    **DEFENDANT**

        WEST CHESTER HOSPITAL LLC
        % GH&R BUSINESS SVCS INC              D - 3
        511 WALNUT ST
        CINCINNATI OH 45202

You are notified
that you have been named Defendant(s) in a complaint filed by

        MELISSA BRAUCHER
        4100 WOODMONT DRIVE
        BATAVIA OH 45103

                                          Plaintiff(s)

in the Hamilton County, COMMON PLEAS CIVIL Division,
**TRACY WINKLER, 1000 MAIN STREET  ROOM 315,
CINCINNATI, OH 45202.**
You are hereby summoned and required to serve upon the plaintiff's
attorney, or upon the plaintiff, if he/she has no attorney of record, a
copy of an answer to the complaint within twenty-eight (28) days after
service of this summons on you, exclusive of the day of service. Your
answer must be filed with the Court within three (3) days after the
service of a copy of the answer on the plaintiff's attorney.

Further, pursuant to Local Rule 10 of Hamilton County, you are also required to
file a Notification Form to receive notice of all future hearings.

If you fail to appear and defend, judgement by default will be rendered
against you for the relief demanded in the attached complaint.

Name and Address of attorney            TRACY WINKLER
MATT HAMMER                        Clerk, Court of Common Pleas
5247 MADISON PIKE                  Hamilton County, Ohio
INDEPENDENCE       KY
41051

                            By  RICK HOFMANN

                                     Deputy

                        Date:   December 23, 2015

D112985507